## STATE OF CONNECTICUT
### *vs.*
## CERTAIN CONTRACEPTIVE MATERIALS

Coram: Hon. Frank P. McEvoy, Judge of the Superior Court, at Waterbury.

MEMORANDUM FILED AUGUST 23, 1939.     126 Conn. 428

*William B. FitzGerald,* of Waterbury, for the State.

*J. Warren Upson,* of Waterbury, for the Defense.

McEVOY, J.   1.   On June 12, 1939, upon the written application of William B. FitzGerald, in his capacity as state's attorney for New Haven County at Waterbury, made to the undersigned as a judge of the Superior Court, a search warrant was issued under the provisions of section 6439 of the General Statutes, Revision of 1930, authorizing a search for and the seizure of certain books, records, registers, instruments, apparatus and appliances kept. . . .and used for the purpose of violating the criminal laws of this state and particularly the provisions of section 6246 and 6562 of the General Statutes, Revision of 1930.

2.   By virtue of that warrant, amongst other items, the following were seized and are now held by the State:

1 Letter headed "three Essentials for Organizing Leagues and Clinics"

. Number of little folders marked "Maternal Health Centers (for birth control information)"

10 Durex Diaphragms

1 L.A.J.

5 Clinic Supply Co. Diaphragms

6 Clinic Supply Co. Dumas Diaphragms

5 H. R. Koromex, 85 Diaphragms

2 H. R. Koromex, 90 Diaphragms

3 Ramses Diaphragms

1 Diaphragm (loose) wrapped in pink Kleenex

2 Boxes Foam Powder

2 Tubes and sponges Durekol Concentrated

15 Lactikol Creme (Durex)

33 Lactikol Formula

1 Tube P. S. Lactic Soap

15 Ramses Diaphragm introducers

1 Aluminum Diaphragm introducer

1 Adjustable Diaphragm inserter from Clinco Products, Chicago

1 Envelope containing one book marked "The Journal of Contraception" distributed by the Journal of Contraception.

12 Tubes of Durekol Formula

1 Box containing a soft rubber pattern of the womb and also a diaphragm wrapped in Kleenex

1 Envelope addressed to Maternal Health Clinic, 43 Field Street, marked "A Journal of Contraception"

1 Magazine, Volume 3, No. 12, "The Journal of Contraception"

1 Box of Durex Diaphragm fitting rings, consisting of 9. Large amount of printed letters addressed to Waterbury Maternal Health Center, Chase Dispensary, Field Street, Waterbury, Conn. "Directions for Patients"

12 Durex deep Dumas Diaphragms

4 Boxes of diaphragms marked "for fitting only"

1 Magazine Volume 3, No. 11, "Journal of Contraception"

1 Leaflet on Foam Powder .

1 Leaflet marked "Price List and General Information"

1 Magazine marked No. 5, Volume 4, "Journal of Contraception"

1 Magazine marked No. 3, Volume 4, "Journal of Contra-

ception"

63 Diaphragms of the Clinco Products, 610 West Randolph Street, Chicago.

3. The 108 rubber diaphragms attached to a metal spring are devices designed solely for contraception, which function by bisecting the vaginal canal and blocking off the cervix of the uterus from exposure to male sperm.

4. A. All of the articles referred to in paragraph 2 hereof except one letter headed "Three Essentials for Organizing Leagues and Clinics", folders marked "Maternal Health Centers (for birth control information)", six issues of "The Journal of Contraception" and one leaflet on Foam Powder are medicinal articles and instruments designed for the sole purpose of preventing conception and were on the 12th day of June, 1939, and prior thereto, kept, stored and used in a building at 43 Field Street, Waterbury, by the Waterbury Maternal Health Center, a voluntary association, for the sole purpose of distribution to married women desiring contraceptive advice and devices to the end that such married women to whom the said medicinal articles and instruments were to be distributed should be prevented from conceiving during or after sexual intercourse.

B. The letter headed "Three Essentials for Organizing Leagues and Clinics", folders marked "Maternal Health Centers (for birth control information)", six issues of "The Journal of Contraception" and one leaflet on Foam Powder, all constitute literature solely concerned with the dissemination of contraceptive advice which were kept stored and used in the building at 43 Field street, Waterbury, by the Waterbury Maternal Health Center, a voluntary association, for the purpose of assisting married women to prevent conception.

5. Under the provisions of section 6441 of the General Statutes, Revision of 1930, the named owners have now entered as defendants and are so referred to in this memorandum.

6. The articles hereinbefore described were seized at the H. S. Chase Memorial Dispensary, 43 Field Street, Waterbury, Connecticut.

7. This dispensary is the Out-Patient department of the Waterbury hospital.

8. On June 12, 1939, an order was directed to and left with

the superintendent of the Waterbury Hospital, ordering him to appear and show cause why the seized articles should not be adjudged a nuisance and ordered to be destroyed.

9. Subsequently the Waterbury Hospital, acting by its superintendent, did not appear, but it did disclaim any interest in the seized articles.

10. The Waterbury Maternal Health Center is a group of volunteers not associated or incorporated under any law of this state.

11. Its officers are: president, Mrs. Clara McTernan; secretary, Mrs. Richard W. Goss, and treasurer, Mrs. Henry C. Griggs, all of Waterbury.

12. The other defendant is: The Connecticut Birth Control League, Inc., a corporation without capital stock.

13. Its articles of association are dated May 11, 1939.

14. These articles of association were filed with the secretary of the State of Connecticut on June 2, 1939.

15. The purposes of the Connecticut Birth Control League are set out in article 2 of the articles of association as follows: "ARTICLE II. The purposes for which said corporation is formed are the following, to wit: 1. To correlate, distribute and disseminate lawful information regarding the political, social and economic effects of uncontrolled procreation throughout the State of Connecticut. 2. To foster research and investigation into problems of reckless breeding and overpopulation and methods of solving these problems. 3. To do all and everything necessary and proper to accomplish any of the purposes, or attain any of the objects or further any of the powers hereinbefore set forth, and to do any other acts or things incidental or pertaining to or growing out of or connected with the aforesaid purposes, objects or powers. 4. Nothing herein contained, however, shall be construed to authorize the corporation to do any act or thing forbidden by the laws of the State of Connecticut or any other State, or of the United States."

16. The purposes of the other defendant, The Waterbury Maternal Health Center, are identical with the purposes of the Connecticut Birth Control League (Par. 2, pleading filed June 20, 1939).

17. Prior to June 12, 1939, a "Birth Control Clinic" was

conducted by the defendants at the Chase Dispensary at 43 Field Street, Waterbury, Connecticut.

18. Since the issuance of the warrant and the seizure of the articles by the state this clinic has been discontinued.

19. On June 30, 1939, the two defendants filed a paper entitled "Plea" in which 12 claims are set out by way of defense.

20. Thereafter briefs were filed by the parties hereto and on July 31, 1939, the defendants' motion to dismiss was denied.

21. In the brief filed by the defendants their arguments are based on six points.

22. Thereafter the parties elected to offer no further evidence.

23. The state asks that the seized articles be found to be a nuisance and that they be ordered to be destroyed.

## II

24. It is claimed by the State that the seized articles were used by the defendants in violation of section 6246 of the General Statutes, Revision of 1930.

25. This section reads as follows: "SEC. 6246. USE OF DRUGS OR INSTRUMENTS TO PREVENT CONCEPTION. Any person who shall use any drug, medicinal article or instrument for the purpose of preventing conception shall be fined not less than fifty dollars or imprisoned not less than sixty days nor more than one year or be both fined and imprisoned."

26. This section was originally enacted in 1879. (Public Acts of 1879, chap. 78.) At that time it was coupled with other provisions which restricted the distribution of obscene literature. In the statutory revision of 1888, however, the section concerning obscene literature was separated from the provisions relating to the use of contraceptive matter (Gen. Stat. [1888] §§ 1537, 1539) so that from 1888 on this section 6246 has remained in the Connecticut statutes in substantially its present form.

27. In the year 1917, and in other years thereafter, various attempts were made to amend the present section 6246, but unsuccessfully.

28. The various bills, nine in number, and the action taken

upon them, are set out in the following paragraphs:

29. 1917 House Bill No. 221. By Mr. Parsons of Enfield (by request), entitled "An Act repealing section 1327 of the General Statutes." To the committee on the Judiciary. Rejected.

30. 1923 House Bill No. 504. By Mr. Sisisky of Enfield, entitled "An Act concerning Birth Control", providing that giving of information or advice or medicine or articles for prevention of conception by a doctor or nurse shall not be a violation of statutes of this state. To the committee on the Judiciary. Rejected.

31. 1925 Senate Bill No. 446. By Senator Doty of the First District (by request) , entitled "An Act concerning the Use of Drugs", providing not less than 50 dollars fine where drugs which may prevent conception are sold without physician's prescription. To the committee on the Judiciary. Rejected.

32. 1927 House Bill No. 105. By Mr. Bridge of Enfield, entitled "An Act concerning the Use of Contraceptives", providing penalty for using instruments to prevent conception. To the committee on the Judiciary. Rejected.

33. 1927 Senate Bill No. 145. By Senator Allen of the 15th District (by request), entitled "An Act concerning the Use of Certain Drugs or Instruments", providing for repeal of law forbidding use of instruments or drugs to prevent conception. To the committee on·the Judiciary. Rejected.

34. 1929 Senate Bill No. 44. By Senator Christ of the 6th District (by request), entitled "An Act repealing Section 6399 of the General Statutes", providing for repeal of statute against birth control. The committee on the Judiciary. Rejected.

35. 1931 House Bill No. 632. By Miss Cheney, of Manchester, entitled "An Act concerning the prevention of Conception under the Direction of a Licensed Physician", providing for legalizing use of contraceptives under direction of licensed physician. To the committee on the Judiciary. Rejected.

36. 1933 House Bill No. 519. By Mr. Baldwin, of Stratford, entitled "An Act amending Section 6247 of the General Statutes", providing that the statute against the use of any pre-

ventive of conception shall not apply to licensed physician when in his opinion pregnancy would be detrimental to the health of the patient or to the child of such patient. To the committee on the Judiciary. Committee reported unfavorably. In the House the motion was made and prevailed that the rules be suspended in order that immediate action might be taken on the bill. The report of the committee was accepted. Proposed Amendment A was offered and adopted. The bill was passed as amended by Schedule A and an aye and nay vote on May 2nd. On May 4th the Senate rejected Schedule A by a rising vote, and rejected the bill as thus amended by a rising vote. On May 9th the House voted for a committee of conference. The Senate voted to grant the request of the House to appoint such a committee of conference, May 10th. The committee of conference recommended the passage of the bill with an accompanying Amendment B. On May 23rd the House reconsidered its former action, and proposed Amendment B was adopted on a rising vote. Amendment A was offered and adopted. Upon a yea and nay vote the bill was passed as amended by Schedules A and B. The bill was tabled in the Senate on May 24th and again on June 6th. No further action was taken.

37. 1935 House Bill No. 850. By Mr. Converse of Willington, entitled "An Act concerning the Use of Drugs or Instruments to prevent Conception" providing for permission to use same in preservation of health. To the committee on the Judiciary. Later it was referred to the committee on Public Health and Safety, but was finally sent back to the committee on the Judiciary. It was never reported out by that committee.

38. At the 1939 session of the Legislature, section 6058 of the General Statutes, Revision of 1930, which has to do with the commission of abortions, was amended to read as follows: "AN ACT CONCERNING ABORTION. "BE IT ENACTED BY THE SENATE AND HOUSE OF REPRESENTATIVES IN GENERAL ASSEMBLY CONVENED: Section 6058 of the general statutes is amended to read as follows: Any person who shall, by publication, lecture or otherwise or by advertisement or by the sale or circulation of any publication, encourage or prompt to the commission of the offenses described in sections 6056 and 6057 of the general statutes, or who shall sell or advertise medicines *or instruments or other devices for the commission of any of said offenses ex-*

*cept to a licensed physician or to a hospital approved by the state department of health,* or who shall advertise any so-called monthly regulator for women, shall be fined not more than five hundred dollars or *imprisoned not more than one year or both.*" The italicized words are new words in the statute.

### III.

39. Taking up, in their order, the six points of the defendants' argument:

As to points 1 and 2, which are directed to the issuance of the search warrant:

40. The application for issuance of the search warrant followed the procedure prescribed by section 6439 of the General Statutes, Revision of 1930, and the allegations of the application as to suspicion and cause for suspicion are phrased exactly as directed by the statute.

41. The words "any of the criminal laws of this state" as used in sections 6339 and 6441 are to be given their natural and plain meaning.

42. In construing a statute and determining its purpose and scope, every part, as far as possible, should be made operative and harmonious with every other part. The intention of the whole controls interpretation of the parts. "Of course this being a criminal prosecution we cannot sustain the conviction of the defendant unless his acts are within the prohibition of one of our criminal laws; but in determining that question we are not obliged to give to a statute a narrow technical meaning contrary to a legislative intent falling 'within its spirit and [its] fair import'." *State vs. Dorau,* 124 Conn. 160, 164, quoting from *State vs. Faro,* 118 id. 267, 273; *Kelly vs. Dewey,* 111 id. 281.

43. A consideration of the whole statute as originally enacted indicates that the intent of the Legislature to have the statute apply to all violations of the criminal law is clear; that consequently no occasion for the application of the doctrine of *ejusdem generis* arises and finally that that doctrine is, in any event, inapplicable to the legislation under consideration because the specific words of the statute embrace all objects of their class and so the statute comes within one of the well recognized exceptions to this particular rule of interpretation.

44. As to point 3, which sets out, generally, the claim that section 6246 of the General Statutes, Revision of 1930, fixes a minimum but not a maximum penalty and that, therefore, it "delegates the legislative power of fixing the penalty for its violation to the judicial branch of the government. . . ."

45. In the constitution of some of our states the duty of fixing a maximum and a minimum fine is expressly imposed upon the legislative branch of the government.

46. In the brief of the defendants it is expressly admitted that: "The Constitution of Connecticut imposes no such obligation upon its legislature."

47. The failure of a statute to fix a maximum fine does not render it unconstitutional under a provision forbidding excessive fines. (In re Hallawell, 8 Cal. App. 563, 97 Pac. 320; Frese vs. State, 23 Fla. 267, 2 S. 1; Latshaw vs. State, 156 Ind. 194, 59 N.E. 471; In re Yell, 107 Mich. 228, 65 N.W. 97; Hamilton vs. State, 68 Tex. Crim. Rep. 363, 153 S.W. 134; Martin, Wise & Fitzhugh vs. Johnson, 11 Tex. Civ. App. 628, 33 S.W. 306; State vs. Constantino, 76 Vt. 192, 56 Atl. 1101; Southern Express Company vs. Commonwealth, 92 Va. 59, 22 S.E. 809.)

48. In England the statutes seldom fixed the amount of a fine to be imposed for their violation, but left it to the discretion of the court, subject only to the limitation of the Bill of Rights prohibiting excessive fines; and the amount of each fine varied according to the character of the crime, the quality and financial condition of the parties, and many other circumstances. 4 Blackstone, Comm. 378, 379 (2 Cooley's Blackstone [2d ed. 1872] 528); 1 Chitty, Criminal Law (5th Am. ed. 1847) 809.

49. In Myers vs. State, 51 Tex. Crim. Rep. 463, 103 S.W. 859, the court held that, notwithstanding a statute which required that no one should be punished for any act or omission unless it was made a penal offense and a penalty was affixed thereto by the written law of the state, a penal statute which fixed a minimum penalty only was not inoperative and void on that account.

50. The fact that a statute does not provide a minimum punishment for an offense is not an objection to it. So held

by the Nebraska Supreme Court in 1907. *Siren vs. State,* 78 Neb. 778, 111 N.W. 798.

51. In *Lee Mow Lin vs. United States,* 250 Fed. 694 (certiorari denied, 247 U. S. 518, 62 L. ed. 1245), the court held that a criminal statute which fixed the penalty for its violation and imprisonment of "not less than five years" was valid to support a sentence for five years and said: (p. 695) "We are of the opinion that the statute fixes a certain punishment of five years, and, as plaintiffs in error did not receive a sentence in excess of five years, they may not raise the question of the validity of a sentence exceeding the minimum penalty fixed by the statute. That the statute is valid, for the purpose of imposing the imprisonment of five years, there seems to be no doubt."

52. By virtue of the alternative nature of the penalty clauses of the statute, the money penalty provision is clearly separable from the imprisonment provision and the invalidity or unconstitutionality of the fine clause cannot affect the constitutional validity of the remainder of the statute. *State vs. Feingold,* 77 Conn. 326; *State vs. Kievman,* 116 id. 458.

53. It should also be observed that, at least, four of the proposed amendments to section 6246 contain the same provision as to fine "not less than fifty dollars." It seems anomalous that, in view of the inclusion of the identical fine provision in the proposed amending bills, that claim should now be made that such inclusion rendered section 6246 unconstitutional for that very reason.

54. Points 4, 5 and 6 are, generally, based upon the claim that, as worded, section 6246 of the General Statutes, Revision of 1930, is indefinite in that it fails to fix a reasonably precise standard of guilt; that it forbids physicians to advise their patients and that it forbids the exercise of a natural right— and is therefore unconstitutional.

55. First as to the claim that the statute, section 6246, is unconstitutional:

Our section 6246 is worded, substantially, as section 21 of chapter 272 of the Massachusetts General Laws (Tercentenary Edition).

56. The meaning and intent of that statute was construed and applied in *Commonwealth vs. Gardner,*—Mass.—, 15 N. E (2d) 222. The opinion in that case was written by Chief

Justice Rugg, whose opinions are universally valued and respected.

57. In defining and construing that statute Chief Justice Rugg used this language (p. 223, 15 N.E. [2d]): "The terms of G. L. (Ter. Ed.) c. 272, §21, already quoted, are plain, unequivocal and peremptory. They contain no exceptions. They are sweeping, absolute, and devoid of ambiguity. They are directed with undeviating explicitness against the prevention of conception by any of the means specified. It would be difficult to select appropriate legislative words to express the thought with greater emphasis. It is a canon of interpretation that the words of a statute are to be construed according to the common and approved usage of the language considered in connection with the cause of its enactment, the preexisting state of the law, and the main object to be accomplished. *Brown vs. Robinson*, 275 Mass. 55, 57, 175 N.E. 269; *Dascalakis vs. Commonwealth*, 244 Mass. 568, 570, 139 N.E. 168.

58. "The provisions of G. L. (Ter. Ed.) c. 272, §21, first appeared in St. 1879, c. 159, in substantially the same words as are now used. That was the earliest enactment in this Commonwealth respecting the prevention of conception, in framing legislation under the police power the Legislature, *without any denial of rights under either the State or the Federal Constitution,* might take the view that the use of contraceptives would not only promote sexual immorality but would expose the Commonwealth to other grave dangers. Even though prevention of conception by medical advice and treatment was not unknown in 1879, and might have been the subject of an exception from the general legislative prohibition if the Legislature had deemed such an exception consonant with public policy, the Legislature had equal power to adopt the contrary view that such an exception would endanger the effectiveness of the statute. If any exception had been intended to the broad prohibition enacted, it would have been easy to give expression to it in the statute. (Italics mine.)

59. "....The inference seems necessary that the moral and social wrongs arising from the prevention of conception appeared to the General Court so threatening in 1879, when the statute was originally enacted, that absolute and unconditional prohibition against the sale, gift, or loan of contraceptive drugs, medicines, or articles for that end was necessary to

meet the conditions. A statute of that nature is constitutional. *Commonwealth vs. Allison,* 227 Mass. 57, 116 N.E. 265. To the same general effect are *Everard's Breweries vs. Day,* 265 U.S. 545, 561, 563, 44 S. Ct. 628, 632, 68 L. Ed. 1174; *Lambert vs. Yellowly,* 272 U.S. 581, 47 S. Ct. 210, 71 L. Ed. 422, 49 A.L.R. 575; *Commonwealth vs. Intoxicating Liquors,* 172 Mass. 311, 52 N.E. 389."

60. As to the general question of the constitutionality of our section 6246 of the General Statutes, Revision of 1930, the following observations and citations would seem to be pertinent (p. 224 of 15 N.E. [2d]):

61. " 'There seems to me substantial reason for saying that contraceptives were meant to be forbidden, whether or not prescribed by physicians, and that no lawful use of them was contemplated.' The cases of *Slee vs. Commissioner of Internal Revenue,* 2 Cir., 42 F. 2d 184, 72 A.L.R. 400, and *United States vs. One Book, Entitled 'Contraception,'* D. C., 51 F. 2d 525, are too plainly distinguishable to require discussion. No one of these Federal decisions is persuasive to a conclusion in favor of these defendants. These cases all depend in large degree upon *People vs. Sanger,* 222 N.Y. 192, 118 N.E. 637, where the governing statute contained in express terms the exception in favor of physicians, which is absent from the statute here controlling. We think such an exception cannot be read into our statute by judicial interpretation. Our statute must be interpreted and enforced as enacted, for the reasons already stated. The relief here urged must be sought from the law-making department and not from the judicial department of government."

62. Every claimed constitutional defect asserted by the defendants to exist in section 6246 of the General Statutes, Revision of 1930, was present in the Massachusetts statute involved in the *Gardner* case. Nevertheless, as pointed out in the defendants' brief, the Supreme Court of the United States dismissed the defendants' appeal in the *Gardner* case for want of a substantial Federal question *(Gardner vs. Massachusetts,* 305 U.S. 559).

63. In *People vs. Byrne,* 163 N.Y.S. 682, the court said (p. 684): "Section 1142 of the Penal Law was enacted in 1887, and section 1141 was amended in the same year. Both sections have been enforced since that time, and a number of convic-

tions had under them. They have never been held unconstitutional. Section 1142 makes it a crime to sell, give away, or exhibit, or offer so to do, or have in possession with such intent, or to advertise for sale or distribution, any article or drug for the prevention of conception, or purporting or represented to be for that purpose, or to give information orally as to when or where such an article or drug can be obtained, or to manufacture either the article or drug. It is urged by the defendant that this is an unreasonable and oppressive enactment, in that it prevents women who do not wish to bear children from adopting means to obviate that result. But this section is not directed against the use of such articles or drugs. It merely prohibits their manufacture and distribution. If it did in terms prevent the use of the articles, and made their use a crime, it would nevertheless be constitutional; and this would be so, even if there were no exception made to the provision.

"The defendant contends that the statute violates section 1 and 6 of article 1 of the state Constitution and the Fourteenth Amendment of the federal Constitution. Section 1, referred to, provides: 'No member of this state shall be.... deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers.'

"Section 6 declares that no person shall be 'deprived of life, liberty or property without due process of law.' The Fourteenth Amendment is of similar purport.

"Unless restrained or prohibited by the Constitution, the legislative power is unlimited. The claim that statutes may be declared void, because deemed to be opposed to natural justice, when they do not violate any constitutional provision, does not find support in law....

64. "....The so-called police power is vested inherently in the Legislature, and is not derived from any constitutional provision. It has never been surrendered, but, on the contrary, has been exercised to the fullest extent. *House vs. Mayes,* 219 U.S. 270, 282, 31 Sup. Ct. 234, 55 L. Ed. 213; *South Carolina vs. United States,* 199 U.S. 437, 454, 26 Sup. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737. The Fourteenth Amendment to the federal Constitution did not interfere with the exercise of this power by the states. *Barbier vs. Connolly,* 113 U.S. 27, 31, 5 Sup. Ct. 357, 28 L. Ed. 923; *Keller vs. United States,* 213 U.S. 138, 145, 29 Sup. Ct. 470, 53 L. Ed. 737, 16 Ann. Cas. 1066....

65.  "It was proper for the Legislature to determine whether the general dissemination of information upon the subject of birth control and the sale of articles designed to prevent conception was prejudicial to public morals and inimical to the welfare and interests of the community. . . .

66.  "A statute making it a crime to advertise of the treatment or cure of venereal diseases has been held to be a valid exercise of the police power of the state, as it is against public policy to advertise that such diseases can be easily and cheaply cured.   'It has a decided tendency to minimize unduly the disastrous consequences of indulging in dissolute action.'   *State vs. Hollinshead,* 77 Or. 473, 477, 151 Pac. 711. See, also, *People vs. Kennedy,* 176 Mich. 384, 395, *et seq.,* 142 N.W. 771, Ann. Cas. 1916A, 895.   The defendant in the Hollinshead Case could have claimed, as does this defendant, that his act in advertising was in the interest of the people who could be benefited by his treatment; but that is not the question which determines the constitutionality of statutes."

67.  In defendants' brief much stress is laid upon the claim that the enforcement of this statute, section 6246 of the General Statutes, Revision of 1930, constitutes an unconstitutional interference with and the deprivation of inherent natural rights. On this phase of the matter the following citation is pertinent:

68.  "The contention that the section is unconstitutional because it 'interferes with the free exercise of conscience and the pursuit of happiness' could probably be made by some defendant against every penal statute.   No authority is cited in support of this contention.   If each individual's conscience and desire for happiness were to determine whether a law is constitutional, none of them could be upheld.   Defendant's counsel, in his brief, says that by this statute 'a woman is denied her absolute right of enjoyment of sexual relations, unless the act be so conducted that pregnancy may be the result of the act. This clearly is an infringement upon her free exercise of conscience and pursuit of happiness.'   The same statement could be made with equal force about the statute defining adultery, or a statute that might be enacted making fornication a crime, or any other definition of a crime." *People vs. Byrne, supra,* p. 686.

69.  On page 4a of the defendants' brief, the following itemization appears: "THE ISSUE.   This Motion to Dismiss

raises questions which have not been previously decided in this State. Is it possible that when the life or health of a married woman may be jeopardized by a pregnancy, she cannot obtain and make use of a contraceptive device upon the advice of her physician in order to prevent the occurrence of a pregnancy? Is it possible that a statute which prevents the use of contraceptive device under such circumstances is constitutional? May the State seize contraceptive devices and destroy them when they are for the use of married women upon the advice of a physician for health reasons?"

70. The record, in this case, does not present that "Issue."

71. The facts upon which this proceeding must be decided are found in the stipulation signed by all parties and duly filed on July 3, 1939.

72. Nowhere, in that stipulation, does it appear that any physician kept or used or prescribed the use of any of these instruments or appliances; nor that the health or life of any woman was endangered; nor that any physician prescribed or was consulted with reference to the use of any of these articles, appliances or instruments.

73. The purposes of each of the defendants are specifically set out and recited in article 2 of the articles of association which will be found in paragraph 15 of this memorandum.

74. These articles of association show that the defendants associated themselves together to "correlate, distribute and disseminate lawful [?] information regarding the political, social and economic effects of uncontrolled procreation throughout the State of Connecticut" (par. 1, art. 2, articles of association) and "to foster research and investigation into problems of reckless breeding and overpopulation and methods of solving these problems." (Par. 2, art. 2, articles of association.)

75. Obviously the determination of the meaning of these words was to rest with these volunteers and according to their standards of regulation.

76. The "purposes" of these defendants, as set out in their brief, have no relation to the purposes set out in their articles of association.

77. The effort of the defendants now seems to be, for the purposes of this proceeding, to disavow their expressed pur-

poses and to attempt to justify their violation of the law under a claim of essential advice by physicians under the necessity of preserving the health and the life of married women.

78. While "the greater contains the less" the converse is not true.

79. The use of the word "lawful" in paragraph 1 of the articles of association and the use of the words contained in paragraph 4 of the same articles of association constitute a contradiction in terms and are redundant and superfluous when considered in connection with the basic purposes set out in all of these articles of association.

80. The purposes of these defendants, as set out in these articles of association, are so obviously opposed to the plain meaning of the words used in section 6246 of the General Statutes, Revision of 1930, that some comment should be made about the ordinary determination of the meaning of our statutes and the duty of judges and courts in construing and interpreting them.

81. " 'The criminal code of this State is clear in its definition of crimes, mild in its punishments, and careful in its provisions for securing full and impartial trials. It is a false humanity which would protect offenders, either by stifling detection and prosecution, or by affording facilities to escape conviction, by unnecessary and artificial technicalities in the administration of the law.' The purpose of the rule of strict construction is not to enable a person to avoid the clear import of a law through some mere technicality, but to enable the people of the State to know clearly and precisely what acts the legislature has forbidden under a penalty, that they may govern their conduct accordingly, and to make sure that no act which the legislature did not intend to include will be held by the courts within the penalty of the law. *Daggett vs. State*, 4 Conn. 60, 63." *State vs. Faro*, 118 Conn. 267, 273, 274.

82. " 'All statutes, whether remedial or penal, should be construed according to the apparent intention of the legislature, to be gathered from the language used, connected with the subject of legislation, and so that the entire language shall have effect, if it can, without defeating the obvious design and purpose of the law. And in doing this, the application of common sense to the language, is not to be excluded.... And there can be no rule which requires courts so to understand a penal

law, as to involve an absurdity, or frustrate the evident design of the law-giver....' " *State vs. Faro, supra,* pp. 272, 273.

83. " 'Courts do not approach the construction of a penal statute creating a new offense against the State with the hostile purpose of crippling a legislative intent plainly expressed.' " *State vs. Faro, supra,* p. 273.

84. " 'The rule of strict construction does not require that the narrowest technical meaning be given to the words employed in a criminal statute in disregard of their context and in frustration of the obvious legislative intent.' *United States vs. Corbett,* 215 U.S. 233, 242, 30 Sup. Ct. 81; *United States vs. Lacher, supra; State vs. Goodwin,* 169 Ind. 265, 267, 82 N.E. 459; *Trammell vs. Victor Mfg. Co.,* 102 S.C. 483, 487, 86 S.E. 1057; *Weirich vs. State,* 140 Wis. 98, 100, 121 N.W. 652." *State vs. Faro, supra,* p. 274.

85. As to the meaning and application of constitutional principles the following citation is of interest: "It is stated in *Scott vs. Sandford,* 60 U.S. (19 How.) 393, 426, 15 L. Ed. 691, 709, that 'no one, we presume, supposes that any change in public opinion or feeling....should induce the court to give to the words of the Constitution a more liberal construction.... than they were intended to bear when the instrument was framed and adopted. Such an argument would be altogether inadmissible in any tribunal called on to interpret it. If any of its provisions are deemed unjust, there is a mode prescribed in the instrument itself by which it may be amended; but while it remains unaltered, it must be construed now as it was understood at the time of its adoption. It is not only the same in words, but the same in meaning, and delegates the same powers to the government, and reserves and secures the same rights and privileges to the citizen; and as long as it continues to exist in its present form, it speaks not only in the same words, but with the same meaning and intent with which it spoke when it came from the hands of its framers, and was voted on and adopted by the people of the United States. Any other rule of construction would abrogate the judicial character of this court, and make it the mere reflex of the popular opinion or passion of the day.' " *Borino vs. Lounsbury,* 86 Conn. 622, 628.

86. The plain words used by one of the defendants in its articles of association, which words were expressly adopted by

the other defendant, clearly indicate that efforts have frequently and continuously been made by forces, whose identity is not apparent upon the present record, to amend the plain meaning of section 6246 of the General Statutes, Revision of 1930.

87. Unsuccessful in these efforts these defendants now ask the judiciary to do what the duly elected representatives of all of the people have so persistently refused to do.

88. It must be assumed that the Legislature acted from motives of public policy and with an intent to protect the health and to preserve the morality of its citizens—present and future.

89. The enactment of the amendment to section 6508 of the General Statutes, Revision of 1930, thus extending the provisions of the statute which has to do with abortion, indicate the continued intention of our legislators to add strength to such provisions—and not permit them to be weakened. (The amended section 6508 is set out in paragraph 38 of this memorandum.)

90. The Supreme Court of Errors, in recognition of the essential distinction between the functions of the legislative and the judicial branches of our government has used this language: "There are certain well known and fundamental rules governing the construction of statutes, the primary one being that the purpose and intent of the legislature shall be ascertained, and if possible made effective. *The intention of the legislature should control absolutely the action of the judiciary; where that intention is clearly ascertained, the courts have no other duty to perform than to execute the legislative will, without any regard to their own views as to the wisdom or justice of the particular enactment.*' Sedgwick on Construction of Statutory Law (2 Ed.) p. 325" (italics mine). *Kelly vs. Dewey,* 111 Conn. 281, 284.

91. " *'You do not legislate but ascertain the purpose of the legislature; and if you can discover what that purpose was, you are bound to enforce it, although you may not approve the motives from which it springs, or the objects which it aims to accomplish.'* Beal's Cardinal Rules of Legal Interpretation (3d Ed.) p. 307, §3." (Italics mine.) *Kelly vs. Dewey, supra,* p. 284.

92. " *'The intent is the vital part, the essence of the law, and the primary rule of construction is to ascertain and give*

effect to that intent.' Lewis' Sutherland Statutory Construction (2d Ed.) p. 693; *United States vs. Chase*, 135 U.S. 255, 10 Sup. Ct. 756; *Hartford vs. Hartford Theological Seminary*, 66 Conn. 475, 34 Atl. 483; *Newton's Appeal*, 84 Conn. 234, 241, 79 Atl. 742; *Bridgeman vs. Derby*, 104 Conn. 1, 8, 132 Atl. 35; *State ex rel. Stamford vs. Board of Purchase and Supplies*, 111 Conn. 147, 149 Atl. 410." (Italics mine.) *Kelly vs. Dewey, supra*, p. 285.

93. "Our concern is, not what did the legislature intend to say, but what is the intent expressed by what it did say. *Connelly vs. Bridgeport*, 104 Conn. 238, 249, 132 Atl. 690; *Chamberlain vs. Bridgeport*, 88 Conn. 480, 490, 91 Atl. 380; *State vs. Faatz*, 83 Conn. 300, 305, 76 Atl. 295; *Walsh vs. Bridgeport*, 88 Conn. 528, 534, 91 Atl. 969. 'We must construe the Act as we find it, without reference to whether we think it would have been or could be improved by the inclusion of other provisions.' *Murphy vs. Way*, 107 Conn. 633, 639, 141 Atl. 858; *State ex rel. Lewis vs. Turney*, 97 Conn. 496, 504, 117 Atl. 499; *Corbin vs. American Industrial Bank & Trust Co.*, 95 Conn. 50, 110 Atl. 459." *Kelly vs. Dewey, supra*, p. 294 (dissenting opinion of Hinman, J.).

94. "If the language is unambiguous 'the judiciary is powerless to intervene even to remedy a mistake. To attempt to do so would be a palpable exercise of legislative functions.' *McKay vs. Fair Haven & W. R. Co., supra*, p. 611." *Kelley vs. Dewey, supra*, p. 294 (dissenting opinion of Hinman, J.).

## IV

## CONCLUSIONS

95. The search warrant was duly and legally issued and, by virtue of the proceedings thereunder, the items named therein were properly seized and are now properly and duly held by the State of Connecticut.

96. Sections 6439 and 6441 of the General Statutes, Revision of 1930, do empower a judge of the Superior Court to order seizure of contraceptive devices.

97. All of the articles seized under the warrant and now held by the State of Connecticut were possessed by the defendants and kept by them for use in violation of the provisions of section 6246 of the General Statutes, Revision of 1930.

98. Section 6246 fixes a definite penalty.

99. Section 6246 fixes a precise standard of guilt and is constitutional.

100. Section 6246 prohibits the use of contraceptive devices for the purpose of preventing conception.

101. There is nothing in this record which would warrant the conclusion that a physician gave any advice respecting the use of any of the articles or material seized.

102. The defendant, the Connecticut Birth Control League, was associated under its articles of association for the express purpose of violating the plain provisions of section 6246.

103. The other defendant filed no articles of association but the individuals composing it associated themselves for the express purpose of violating the plain provisions of section 6246 in the same manner as its companion, the other defendant.

104. This is not a situation in which the defendants were honestly mistaken as to the meaning or interpretation of section 6246, but it is a situation brought about by the express intention of both defendants to defy and violate the clearly expressed intention of the Legislature.

105. Under these circumstances the defendants must obey and respect the law. "If not, the defendants must choose between conforming to the law and taking the consequences of its violation." *Blydenburgh vs. Miles,* 39 Conn. 484, 497.

106. The amendment to section 6058, which is "an act concerning abortion", is indicative of the legislative intent to extend, rather than to restrict or modify, the laws designed to protect and preserve the public health and morals and to increase the penalty for violation.

107. It is significant that, although the defendants originally functioned under the auspices of the H. S. Chase Memorial Dispensary which is the out-patient department of the Waterbury Hospital then, immediately upon the origin of these proceedings, the Waterbury Hospital disclaimed any interest in any of the seized articles and discontinued any connection with the birth control clinic.

108. This action on the part of the Waterbury Hospital evidences its design to act in compliance with, rather than in defiance of, the long established provisions of section 6246.

109. This action, or lack of action, on the part of the Waterbury Hospital may fairly be attributable to its design to act in compliance with, rather than in defiance of the law enacted by the state, under whose beneficient laws this eleemosynary and state-assisted corporation was incorporated, organized and now continues its existence.

110. The articles so seized were held and used by the defendants in violation of the law as laid down in section 6246 and are a nuisance under the provisions of section 6439 and section 6441 and they ought to be destroyed.

111. All of the parties hereto, orally and in their briefs, have requested that, in the event that an order of destruction be entered, that the execution of the order of destruction be deferred and suspended until the determination of these proceedings in this case and three other pending cases.

112. This is a reasonable and orderly request and it ought to be and is granted.

113. An order may be entered that all of the articles specifically itemized and described in paragraph 2 of this memorandum be destroyed, but that their destruction be postponed until after the conclusion of these proceedings and until after the conclusion of the proceedings in

Case No. 6222, *State vs. Roger B. Nelson;*

Case No. 6223, *State vs. Clara B. McTernan;*

Case No. 6224, *State vs. William A. Goodrich.*

(7 Conn. Sup. 262.)

114. Order may enter accordingly.