STATE OF CONNECTICUT *v.* ERNEST DORAU.

MALTBIE, C. J., HINMAN, AVERY, BROWN and JENNINGS, Js.

Argued March 2d—decided April 8th, 1938.

*Philip Pond,* and *George S. Ryan* of the Massachusetts bar, with whom, on the brief, was *Emmett Thurman,* of Denver, Colorado, for the appellant (defendant).

*Bertrand E. Spencer,* State's Attorney, submitted the case of the appellee (the State) upon brief.

MALTBIE, C. J. The defendant, manager of a motion picture theater in Middletown, having been convicted of a violation of law in operating a so-called "Bank Night," appealed. The case was submitted to the trial court upon an agreed statement of facts and the nominal penalty imposed shows that this is a test case to determine whether such Nights as conducted by the defendant violate our criminal law. A Colorado corporation owns the rights in the plan of operating these Nights, protected by copyright and patent application, and it gives licenses to theaters to use the plan, the defendant's theater being so licensed. The plan operates in this way: The theater provides a

registration book which any person over eighteen years of age, whether a patron of the theater or not, may sign. The book is placed in the lobby or outside the doors of the theater and no charge is made for registration nor need one who does so buy a ticket to the theater. A number is given to each name. On stated occasions the numbers representing all the names registered are placed in a container on the stage of the theater and one number is drawn. The name of the person having that registration number is announced both inside and outside the theater and on coming forward within a certain time, he receives a sum of money which the theater provides from its own funds. If the person whose number is drawn is outside the theater he is permitted to enter and claim the award without paying admission. If he does not come forward within the time set the money is added to the sum to be awarded on the next Bank Night. Under the plan various safeguards are thrown about its operation to insure fairness in the allotment of the money.

The defendant in carrying out the plan conformed to the method above described. Substantially the same quantity and quality of entertainment has been provided on Bank Nights as on other nights. It has frequently happened that the person whose number was drawn did not purchase a ticket of admission to the theater, but was outside when the name of the winner was announced, and was admitted without charge to claim the award. The plan is an advertising device to increase the attendance at the theater and as used by the defendant and other theaters it very markedly accomplishes this purpose. The sum provided for the award each week is $35 but due to the failure to claim the award by the person whose number is drawn and its addition to the sum provided for

the next Bank Night there have been awards of $140, $285, and $630, and the average award is about $175.

Nothing can be said from the standpoint of public morals in defense of this plan. It is true that under it no persons risk any money of their own aside from the fact that no doubt by it many persons are induced to attend the theater when otherwise they would not. The evil of gambling and like practices is not by any means confined to the impoverishment and squandering of the money which directly results from the making of a wager. In *Iris Amusement Corp.* v. *Kelly,* 366 Ill. 256, 8 N. E. (2d) 648, the court, holding that the operation of a "Bank Night" constituted a lottery and finding the consideration or price generally regarded as necessary to constitute a lottery in the fact that those who entered the theater in actual fact paid for those on the outside as well, said (p. 267): "In this scheme there is present every element of the evils attendant upon mass gambling. A small stake concealed within the price of admission gives its chance for a large prize, which may become large enough to arouse intense cupidity; there is the excitement of drawing a lucky number with the attendant exultation for one fortunate individual; there is depression and disappointment for a thousand losers, many of whom must think enviously of what they could do with so much money had they won it, and there is the constant temptation to continue to play in the hope of winning. We have thus created cupidity, envy, jealousy and temptation—the very things sought to be avoided by that enlightened public policy of most of the world which has outlawed lotteries." In *State* v. *Shorts,* 32 N. J. L. 398, 401, Beasley, C. J., said: "A lottery, says Johnson, is a 'game of chance; a distribution of prizes by chance.' This ingredient of chance is,

obviously, the evil principle against which all prohibitory laws are aimed."

This our statutes have recognized since the earliest times and today they provide a penalty to be imposed upon anyone who "shall play at any game for any valuable thing," without any requirement that the player himself risk anything, as when, for instance, the gaming is for money or property put up by another. General Statutes, §§ 6317, 6318, 6320; *State* v. *Harbourne,* 70 Conn. 484, 490, 40 Atl. 179. Another of our statutes is strongly suggestive that the plan of Bank Nights is contrary to the public policy of this State. It provides a penalty to be imposed upon any person who shall sell any personal property, "and shall offer the purchaser any interest in other property to be ascertained by lot or hazard or any articles of value, or any interest therein, as a present or gratuity, the quality, kind or value of which shall be unknown to the purchaser at the time of sale." General Statutes, § 6334. The evil which arises out of such practices is that it fosters in men and women a desire to gain profit, not by their own efforts, not as a reward for skill or accomplishment, but solely by the lucky turn of chance, that it encourages in them the gambling instinct and that it makes it appeal to the baser elements in their nature. The defendant suggests as one reason for the unusual popularity of Bank Night "the accumulative award," but the very fact that because of it large sums are at times awarded intensifies such evils as inhere in the plan. It is designed solely to serve the selfish ends of the owners of theaters who operate it. It is so devised that it may, if possible, circumvent statutory provisions outlawing gambling, lotteries, and like practices. The question before us is whether that has been successfully accomplished as regards our own statutes. Of course this being a crim-

inal prosecution we cannot sustain the conviction of the defendant unless his acts are within the prohibition of one of our criminal laws; but in determining that question we are not obliged to give to a statute a narrow technical meaning contrary to a legislative intent falling "within its spirit and [its] fair import." *State* v. *Faro,* 118 Conn. 267, 273, 171 Atl. 660.

In other jurisdictions there have been many cases involving the legality of the plan with varying decisions. See Notes, 103 A. L. R. 866, 109 A. L. R. 709, and a very inclusive article, 1 American Lawyer, 5. No purpose would be served by any extended reference to these cases, for each was necessarily based upon the statutes of a particular jurisdiction. The decision of almost all of them depended upon the question whether the plan constituted a forbidden lottery. As we shall point out, our own statute has a broader scope than merely to penalize lotteries, and whether the plan is a lottery in the strict meaning of that word we do not need to consider. Of the many cases we have examined only two present situations sufficiently similar to our own law to justify comment; and to these we shall refer later.

The statute under which the defendant was convicted provides as follows: "Any person who shall set up any lottery to raise and collect money or for the sale of any property or shall, by any kind of hazard, sell or dispose of any kind of property or set up a notification to induce people to bring and deposit property to be disposed of in any such manner or to risk their money or credit for the purpose of any such sale or disposition, shall be fined not more than one hundred dollars or imprisoned not more than one year." General Statutes, § 6332. Previous to 1834 lotteries were not in themselves illegal in this State, often having been authorized by the General Court and General

Assembly, and the statutes were directed to preventing the operation of any not so authorized and to the regulation of those authorized. Laws of 1830, Chap. XIX; Statutes of 1835, pp. 141, 365. The prototype of § 6332 was passed in 1728, and as printed in the acts of that year (p. 351) it provided "that whosoever shall presume to set up any lottery for the sale of goods, or to sell or vend any parcel, parcels or quantity of goods, monies, or other things whatsoever, by lottery; or by wagers, or shooting, or any other way or exercise whatsoever, shall offer to vend, put off or dispose of any goods or monies collected or exposed to be run at such adventures; or set up notifications to entice people to bring in and deposit their money for the carrying on the designs aforesaid, and be duly convicted thereof," shall forfeit the value of the goods or money exposed or proposed to be exposed for sale or drawn for. This continued to be substantially the form of the statute until the Revision of 1821. It may be noted in passing that the printed statute does not conform in two respects to the law as it actually passed the General Court; the manuscript clearly uses the words "wagers on shooting" and in place of the word "run" it reads "wun," evidently meaning "won."

In the Revision of 1821 (p. 166) the language was modified so that the second clause read "or if any person shall, by wagers, shooting, or any kind of hazard, sell and dispose of any kind of property, or set up notifications to induce people to bring in, and deposit property to be disposed of in such manner, or to risk their money or credit in carrying on such designs," and the word "hazard" was here first used. The committee which prepared that Revision in reporting to the General Assembly states that it had not hesitated to exercise to the full extent the powers given it in the attempt to present "a concise, perspicuous and com-

prehensive code" and, further, that acts which had been but little altered were submitted to committees of the General Assembly for examination and where more extended changes were deemed necessary original bills were prepared, and that the whole subject underwent a patient and careful examination before the laws were finally adopted. The words in the statute before the Revision of 1821, prohibiting the disposal of property by "any other way or exercise whatsoever," were vague and uncertain, and when, in that Revision, the provision was made reasonably specific by substituting for them the words by "any kind of hazard," this was the deliberate act of the General Assembly and determined the scope the law was intended thereafter to have. In 1849 the law took its present shape, except that it still contained the words "wagers, shooting, or" before the words "any kind of hazard," which were omitted in the Revision of 1875. Revision of 1849, p. 241; 1875, p. 516.

It is contended that the word "hazard" implies that something is risked, that as some of those who participated in the plan did not even buy tickets to the theater, and as those who did received the same entertainment for the same price that they could have had any night, none of them risked anything, and that therefore this provision of the statute would not apply. We have no need to consider the accuracy of the minor premise because the major premise is unsound. It is true that the word "hazard" in its origin signified a certain game of chance. Oxford Dictionary, "Hazard." But when, in 1821, the word was brought into the statute it had largely lost that primary meaning. Thus Samuel Johnson, in his Dictionary of 1783, gives as the first of three definitions "chance; accident; fortuitous happening," and Webster, in the 1828 edition of his Dictionary, follows suit. Of far more signifi-

cance in determining the meaning of the word "hazard" as used in the statute is, however, another consideration. "In construing a statute and determining its purpose and scope, every part should, so far as possible, be made operative and harmonious with every other part." *Savings Bank of Rockville* v. *Wilcox*, 117 Conn. 188, 191, 167 Atl. 709. Plainly the second clause of the statute was intended to include acts outside the scope of those which would constitute a lottery. There are three elements which are generally held to be necessary to constitute a lottery: a prize, a chance, and a price. *Commonwealth* v. *Wall* (Massachusetts) 3 N. E. (2d) 28; *State* v. *Eames*, 87 N. H. 477, 183 Atl. 590; Bishop, Statutory Crimes (3d Ed.) § 952. If "hazard" as used in the statute be understood to imply that anyone seeking to participate in an enterprise by which property is disposed of by chance must risk some money or property of his own, this clause would add little or nothing to the statute. Indeed, the defendant recognizes this in his brief when he says that our statutes do not define a lottery unless the second clause be considered as a definition. Unless a broader scope be given to the clause than the defendant claims, there would seem to be little reason for the retention of the provision in 1821 and throughout the subsequent years. But effect can be given to it if the word "hazard" be understood in the sense of the primary definition given to it by lexicographers at about the time it was introduced into the law and which is still applicable, "chance." Our statute then prohibits not merely lotteries in the strict sense of the term, but certainly covers enterprises of the general nature of lotteries wherein chance is the predominating element, even though those who participate directly risk no money or property of their own.

In *Society Theatre* v. *Seattle*, 118 Wash. 258, 203 Pac. 21, the court had before it an ordinance which provided: "It shall be unlawful for any person to open, conduct, maintain or carry on, or be in any manner connected with, any lottery or any establishment or business, by whatever name it may be known, wherein any property is sold or disposed of by chance." The court, while holding that upon the facts before it the defendants had conducted a lottery, went on to point out that the ordinance was broader than a strict prohibition of lotteries, and said (p. 260) that "it is perfectly plain to us that the business of the respondents, carried on as it is, comes directly within the inhibition of the ordinance, because respondents are directly connected with a business where 'property is sold or disposed of by chance.' This ordinance is broad. It gives its own definition of a lottery, which is probably somewhat wider than the usual definition given by the dictionaries." In *City of Wink* v. *Griffith Amusement Co.* (Texas) 100 S. W. (2d) 695, the court was considering the provision of the constitution of Texas which condemned the operation of "lotteries, gift enterprises, and other evasions involving the lottery principle," and it said: "But the constitution condemns those things which fall short of containing all the essential elements of a lottery, namely those things which involve the lottery principle, of which 'chance' is the one which constitutes the very basis of a lottery, and without which it would not be a lottery."

Whatever may be the result in other jurisdictions not having a statute such as ours, the conduct of "Bank Night" under the plan operated by the defendant is a violation of our law.

There is no error.

In this opinion HINMAN, BROWN and JENNINGS, Js., concurred; AVERY, J., concurred in the result, on the ground that "Bank Nights" constituted lotteries.