THE EVENING SENTINEL ET AL. *v.* NATIONAL
ORGANIZATION FOR WOMEN

THE EVENING SENTINEL ET AL. *v.* COMMISSION ON
HUMAN RIGHTS AND OPPORTUNITIES

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued November 7, 1974—decision released February 25, 1975

*William J. Secor, Jr.,* with whom was *Donald McPartland,* for the appellants (plaintiffs) in each case.

*Bernard F. McGovern, Jr.,* assistant attorney general, with whom, on the brief, were *Robert K. Killian,* attorney general, and *F. Michael Ahern,* assistant attorney general, for the appellee (defendant commission).

*Marilyn P. A. Seichter* appeared for the appellee (National Organization for Women) but did not argue the cause.

SHAPIRO, J.   The plaintiffs, whose newspapers are published and circulated in this state, have appealed from the judgments of the Court of Common Pleas dismissing their appeals from the action of the Commission on Human Rights and Opportunities ordering the plaintiffs to "cease and desist the use of segregated columns for classified employment based upon sex." The plaintiffs attack a finding of fact by the hearing tribunal,[1] claim that the conclusions of the hearing tribunal were contrary to law and not supported by substantial and competent evidence, and complain that the order of the hearing tribunal is excessively broad.

The trial court in its memorandum of decision recited the material facts as set forth in the hearing tribunal's decision. The court found that there was

---

[1] The plaintiffs assign error in the refusal of the Court of Common Pleas to correct the finding of the hearing tribunal. We need not reach that assertion as the main issue is dispositive of the appeal.

substantial and competent evidence submitted to the hearing tribunal that the plaintiffs aided and abetted the doing of acts declared to be unfair employment practices under General Statutes § 31-126, being a portion of chapter 563, the Connecticut Fair Employment Practices Act, as amended, and hereinafter referred to as CFEP.[2] Whether the court's conclusion is correct depends upon the application of the provision in General Statutes § 31-128 (b) that "[t]he findings of the hearing tribunal as to the facts, if supported by substantial and competent evidence, shall be conclusive." *Board of Education* v. *Commission on Civil Rights,* 153 Conn. 652, 659, 220 A.2d 278. It is undisputed that the plaintiffs segregate their help-wanted advertisements into three categories: Help Wanted Male, Help Wanted Female, and Help Wanted Male/Female.

The issue underlying these appeals is whether the maintenance of sex-designated employment opportunities columns constitutes a per se violation of General Statutes § 31-126 of the CFEP. A resolu-

[2] Section 31-126 provides in pertinent part as follows: "It shall be an unfair employment practice (a) for an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, because of the race, color, religious creed, age, sex, national origin or ancestry of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against him in compensation or in terms, conditions or privileges of employment; . . . (e) for any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts herein declared to be unfair employment practices or to attempt to do so; (f) for any employer, employment agency, labor organization or person, except in the case of a bona fide occupational qualification or need, to advertise employment opportunities in such a manner as to restrict such employment so as to discriminate against individuals because of their race, color, religious creed, age, sex, national origin or ancestry."

tion of this question in the affirmative is dispositive of the plaintiffs' attack on the finding and conclusions of the hearing tribunal because the parties do not dispute that such columns exist in the plaintiffs' newspapers. It also follows, as we later discuss the issue, that an order prohibiting a practice which is a per se violation is not too broad if its terms are limited to eliminating the illegal practice.

At the threshold of our discussion we point out that this court has held repeatedly that where the meaning of a statute is plain and unambiguous, the enactment speaks for itself and there is no occasion to construe it. *Meriden* v. *Board of Tax Review,* 161 Conn. 396, 402, 288 A.2d 435; 2A Sutherland, Statutory Construction (4th Ed.) §§ 46.01, 46.03–.04. There is no indication in the text of § 31-126 which would permit classification based upon sex to be treated differently from classifications based upon race, religion, age, national origin or ancestry. *Dent-Craft Laboratories of Connecticut, Inc.* v. *Sullivan,* 148 Conn. 94, 96, 167 A.2d 714; *General Realty Improvement Co.* v. *New Haven,* 133 Conn. 238, 241, 50 A.2d 59; see *State* v. *Dorau,* 124 Conn. 160, 168, 198 A. 573; 2A Sutherland, op. cit. § 47.17.

The Supreme Court of the United States in *Brown* v. *Board of Education,* 347 U.S. 483, 495, 74 S. Ct. 686, 98 L. Ed. 873, adopted the principle that there can be no such thing as separate but equal. Thus there can be no doubt that segregating employment opportunities advertisements into race, religion, age, national origin or ancestry or sex classifications constitutes discrimination. General Statutes § 31-122 (j); *Pittsburgh Press Co.* v. *Human Rel. Comm.,* 413 U.S. 376, 387–88, 93 S. Ct. 2553, 37 L. Ed. 2d 669; *Frontiero* v. *Richardson,*

411 U.S. 677, 682, 93 S. Ct. 1764, 36 L. Ed. 2d 583; *Reed* v. *Reed,* 404 U.S. 71, 92 S. Ct. 251, 30 L. Ed. 2d 225; *Evans* v. *Sheraton Park Hotel,* 503 F.2d 177, 184–85 (D.C. Cir.); *Head* v. *Timken Roller Bearing Co.,* 486 F.2d 870, 879 (6th Cir.); *United States* v. *International Longshoremen's Assn.,* 460 F.2d 497 (4th Cir.), cert. denied, 409 U.S. 1007, 93 S. Ct. 439, 34 L. Ed. 2d 300; *Morrow* v. *Mississippi Publishers Corporation,* 5 F.E.P. Cases 287, 289 (S.D. Miss.); *K-Mart Discount Stores* v. *Colorado Civil Rights Comm.,* 511 P.2d 926, 927 (Colo.); *Passaic Daily News* v. *Blair,* 63 N.J. 474, 308 A.2d 649; *N.O.W.* v. *State Division of Human Rights,* 34 N.Y.2d 416, 314 N.E.2d 867; *Pittsburgh Press Co.* v. *Pittsburgh Comm. on Human Rel.,* 4 Pa. Comwlth. 448, 287 A.2d 161, 167, aff'd, *Pittsburgh Press Co.* v. *Human Rel. Comm.,* supra; note, "Discrimination in Classified Advertising," 38 Albany L. Rev. 847, 860–64.

Subsection (f) of § 31-126 does not allow any "person, except in the case of a bona fide occupational qualification or need, to advertise employment opportunities in such a manner as to restrict such employment so as to discriminate . . . ." It is manifest that according to this statute a corporation is not privileged under this act to do what an individual is precluded from doing. General Statutes §§ 31-122 (b), 1-1 (k). When a newspaper publishes an advertising section, it is engaging in advertising and thus comes within the scope of § 31-126 (f). *Morrow* v. *Mississippi Publishers Corporation,* supra; *Passaic Daily News* v. *Blair,* supra; *N.O.W.* v. *State Division of Human Rights,* supra; *Pittsburgh Press Co.* v. *Pittsburgh Comm. on Human Rel.,* supra.

It would negate the effectiveness of the act, as well as conflict with the meaning of the statute, if the person placing the advertisement were precluded from discrimination, but not the person printing and distributing the advertisement. A statute should not be interpreted in any way to thwart its purpose. *Turner* v. *Scanlon,* 146 Conn. 149, 157, 148 A.2d 334.

Subsection (e) of § 31-126 prohibits *"any person, whether an employer ... or not, to aid, abet ... the doing of any of the acts herein declared to be unfair employment practices . . . ."* (Emphasis supplied.) It is clear that the subsections aim at curbing certain *acts* which are labeled to be unfair employment practices. Thus, although a newspaper is not an employment agency, *Brush* v. *San Francisco Newspaper Printing Co.,* 315 F. Sup. 577 (N.D. Cal.), aff'd, 469 F.2d 89 (9th Cir.), cert. denied, 410 U.S. 943, 93 S. Ct. 1369, 35 L. Ed. 2d 609, it still may violate the CFEP by aiding and abetting the commission of unfair employment practices. There is no indication that this prohibition is to apply solely to persons who aid and abet those employers not exempted from the act.[3] The wording of the statute plainly is aimed at all persons who aid the doing of an unfair employment practice. Thus, although an employer may be exempt from the application of this act, discrimination as defined in § 31-126 (a) constitutes an unfair employment practice, which others, including newspapers, are not allowed to promote.

---

[3] Section 31-122 (f) defines "employer" to include "any person or employer with three or more persons in his employ." Significantly the term "unfair employment practice" is separately defined and is not dependent upon the term "employer": "(e) 'unfair employment practice' means only any unfair employment practice specified in section 31-126." Id.

The plaintiffs rely on two California cases for the assertion that in order for the aiding and abetting to be prohibited, it must first be shown, in each individual case, that the plaintiff had knowledge of the illegal purpose and intent. *Winning* v. *Board of Dental Examiners,* 114 Cal. App. 658, 300 P. 866; *Osborne* v. *Baughman,* 85 Cal. App. 224, 259 P. 70. These cases are not relevant because they stand for the proposition that aiding and abetting may impute knowledge to the actors and because both cases involve the drastic remedy of suspending professional licenses.

To apply the plaintiffs' approach would negate the CFEP by encouraging newspapers to shut their eyes to fact and law and would dilute the principle that ignorance of the law is no excuse. To some extent, it would thwart the purpose of the CFEP and render it unenforceable. See *Pond* v. *Braniff Airways, Inc.,* 500 F.2d 161, 166 (5th Cir.); *International Brotherhood* v. *Commission on Civil Rights,* 18 Conn. Sup. 125, 130, aff'd, 140 Conn. 537, 544, 102 A.2d 366; *Matter of Holland* v. *Edwards,* 307 N.Y. 38, 45, 119 N.E.2d 581. "It seems to us that the prominent, if not indispensable place of newspaper classified advertising in the employment recruiting field is such that it is unrealistic to contend that a publisher of a paper who either initiates or acquiesces in advertising publication practices which discriminate or encourage or facilitate discrimination in employment is not 'aiding' in such discrimination within the meaning of the statute. To borrow, as do appellants, from definitions of aiding and abetting in the criminal field, where criminal intent is stressed because the abettor is a criminal principal, is entirely inappropriate in the context of the present statute which is basically a

remedial, not a criminal one." *Passaic Daily News v. Blair,* supra, 488. A newspaper cannot "well assert that there is no causal relationship between the proscribed practice and the fostering of sex-discrimination in employment. Such a relationship is not only a matter of justifiable lay inference on the face of things . . . ." Id., 484.

Specific intent is not an element requisite to a violation of the CFEP. This has been accepted in federal cases where good faith was held to be no defense. *Satterwhite v. United Parcel Service, Inc.,* 496 F.2d 448, 451 (10th Cir.); *Williams v. General Foods Corporation,* 492 F.2d 399 (7th Cir.). This interpretation has been applied in other fields, for example, federal antitrust law. *United States v. Griffith,* 334 U.S. 100, 105, 68 S. Ct. 941, 92 L. Ed. 1236; *Parke, Austin & Lipscomb v. F.T.C.,* 142 F.2d 437, 440 (2d Cir.), cert. denied, 323 U.S. 753, 65 S. Ct. 86, 89 L. Ed. 603 (unfair trade practices); von Kalinowski, 16 Business Organizations, Antitrust Laws & Trade Regulation § 8.02[4] (monopolization). "This rule is founded upon the principle that the primary concern of the Act is to protect the public . . . rather than punish the violator of the Act." von Kalinowski, 16E op. cit. § 42.02; see *Gimbel Bros. v. F.T.C.,* 116 F.2d 578, 579 (2d Cir.). In the present case, the decision of the commission does not penalize or injure the plaintiffs in any way; the plaintiffs merely have been reminded as to what the law is and ordered to follow it. *N.O.W. v. State Division of Human Rights,* supra, 421; *Pittsburgh Press Co. v. Pittsburgh Comm. on Human Rel.,* supra.

The CFEP act is a segment of legislation designed to protect individuals from discrimination

because of their sex, age, religion, race, color, national origin or ancestry. *Scovill Mfg. Co.* v. *Commission on Civil Rights,* 153 Conn. 170, 173, 215 A.2d 130. The people of this state and their legislators have unambiguously indicated an intent to abolish sex discrimination. Connecticut has approved the pending equal rights amendment to the United States constitution, House J.R. No. 1, Jan. Sess., pt. 1, vol. 1, 1973 Public Acts, p. LXXIV, and its own Connecticut equal rights amendment,[4] in addition to the CFEP legislation in the present case. The history of this mass of legislation evidences a firm commitment not only to end discrimination against women, but also to do away with sex discrimination altogether.

In holding that sex-classification in help-wanted advertising constitutes a per se violation of Connecticut law, we are buttressed by strong authorities in the interpretation of federal legislation and that of other states; some cases were based on and argued on issues almost identical to those in the present case. 29 C.F.R. § 1604.5;[5] *Pittsburgh Press Co.* v. *Human Rel. Comm.,* supra; *Passaic Daily*

[4] House J.R. No. 4, Feb. Sess. 1972, p. XI reads: "Section 20 of article first of the constitution is amended to read as follows: No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his OR HER civil or political rights because of religion, race, color, ancestry [or], national origin OR SEX." Approved November 5, 1974.

[5] The plaintiffs claim that the federal fair employment practices legislation, 42 U.S.C. § 2000e–2 (d) (hereinafter FEP), has a qualified proscription for sex discrimination, whereas for race it is absolute, and that our interpretation of bona fide occupational qualification (hereinafter BFOQ) must coincide with the federal statute, namely that it must be "reasonably necessary to the normal operation of the particular business or enterprise." Id. (e). We need only state that these qualifications are not written into the

*News* v. *Blair,* supra; *N.O.W.* v. *State Division of Human Rights,* supra; *Pittsburgh Press Co.* v. *Pittsburgh Comm. on Human Rel.,* supra.

As indicated above, § 31-126 is designed to prohibit acts, not status. It is part of a policy to eliminate sex-discrimination in its subtle as well as overt forms. The very act of classifying individuals by means of criteria irrelevant to the ultimate end sought to be accomplished operates in a discriminatory manner. Such discrimination is destructive to society as a whole in that it eliminates a class of individuals who otherwise could have made vital and fresh contributions. *Diaz* v. *Pan American World Airways, Inc.,* 442 F.2d 385, 386–88 (5th Cir.), cert. denied, 404 U.S. 950, 92 S. Ct. 275, 30 L. Ed. 2d 267.

Symbolic discrimination as in the present case is every bit as restrictive as naked exclusions. *K-Mart Discount Stores* v. *Colorado Civil Rights Commission,* supra, 927; *N.O.W.* v. *State Division of Human Rights,* supra; *Matter of Holland* v. *Edwards,* supra. The distinction between "help wanted men" and "help wanted men only, no women" is nugatory. The restrictive effects of such advertising are amply demonstrated in the defendants' appendix and in the

Connecticut law. In light of a release of December 2, 1969, by the commission, to the effect that the CFEP is in many respects stronger than the FEP, we follow the usual rule in statutory interpretation that the difference between the state and federal acts was purposeful and is meaningful. See *Savings Bank of Rockville* v. *Wilcox,* 117 Conn. 188, 195, 167 A. 709; *Kelly* v. *Dewey,* 111 Conn. 281, 291, 149 A. 840. The plaintiffs' further claim that Connecticut is preempted from enacting civil rights legislation, especially in light of the gaps in the federal legislation, is wholly frivolous. Consequently, the federal Equal Employment Opportunity Commission's Guidelines on Discrimination Because of Sex define the beginning and not the end of our approach to the subject. 29 C.F.R. 1604. See, e.g., *Passaic Daily News* v. *Blair,* supra, 484, 488.

opinions of other courts, and they are confirmed by application of common sense. *Pittsburgh Press Co.* v. *Human Rel. Comm.*, supra, 387–88, 393; *Head* v. *Timken Roller Bearing Co.*, supra; *Gillin* v. *Federal Paper Bd. Co., Inc.*, 479 F.2d 97, 102 (2d Cir.); see Boyer, "Help-Wanted Advertising – Everywoman's Barrier," 23 Hastings L.J. 221, 222–23; note, "Discrimination in Classified Advertising," 38 Albany L. Rev. 860–64. The CFEP operates to eliminate not only the unjustified exclusion of people from occupations, but also the practices leading to and facilitating such discrimination.

Consequently, it follows that if a practice is condemned by the CFEP, an order limited to prohibiting the proscribed practice is not too broad.[6] Only those parties specifically exempted are not required to follow the terms of the act. *H. Duys & Co.* v. *Tone*, 125 Conn. 300, 311–12, 5 A.2d 23.

The plaintiffs claim that the order issued by the commission was too broad because it precluded discriminatory advertising where there exists a bona fide occupational qualification (BFOQ). A BFOQ exists only if no member of the class excluded is physically capable of performing the tasks required by the job. See, generally, Equal Employment Opportunities Commission, Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604;

---

[6] Although in *Pittsburgh Press Co.* v. *Pittsburgh Comm. on Human Rel.*, supra, an order was held to be too broad, we, however, follow the later cases where the legislation involved is closer to ours. *Passaic Daily News* v. *Blair*, supra; *N.O.W.* v. *State Division of Human Rights*, supra. The distinction lies in that Pittsburgh had set-up procedures to allow prior certification of BFOQ status. The CFEP has no such provisions, indicating that BFOQ status is even less favored in this state than in Pittsburgh. See note, "Elimination of Sexually Segregated Employment Ads: A Step Toward Equal Employment Opportunity," 26 U. Fla. L. Rev. 577.

*Griggs* v. *Duke Power Co.,* 401 U.S. 424, 436, 91 S. Ct. 849, 28 L. Ed. 2d 158; *Long* v. *Sapp,* 502 F.2d 34, 39–40 (5th Cir.); *Pond* v. *Braniff Airways, Inc.,* supra, 166; *Williams* v. *Matthews Co.,* 499 F.2d 819 (8th Cir.); *Head* v. *Timken Roller Bearing Co.,* supra, 879; *Gillin* v. *Federal Paper Bd. Co., Inc.,* supra, 102; *Rosenfeld* v. *Southern Pacific Co.,* 444 F.2d 1219 (9th Cir.); *Robinson* v. *Lorillard Corporation,* 444 F.2d 791, 795, 798 (4th Cir.), cert. dismissed, 404 U.S. 1006, 1007, 92 S. Ct. 573, 651, 30 L. Ed. 2d 655; *Diaz* v. *Pan American World Airways, Inc.,* supra; *Bowe* v. *Colgate-Palmolive Co.,* 416 F.2d 711, 717 (7th Cir.); *Weeks* v. *Southern Bell Telephone & Telegraph Co.,* 408 F.2d 228, 235 (5th Cir.); *Trivett* v. *Tri-State Container Corporation,* 368 F. Sup. 137 (E.D. Tenn.); *Warshafsky* v. *Journal Co.,* 7 F.E.P. Cases 189, 191 (Wis. Cir.); annot., 12 A.L.R. Fed. 15, 39, §§ 21–23; cf. *International Brotherhood* v. *Commission on Civil Rights,* supra, 544; *Bernie* v. *Leonard,* 40 App. Div. 2d 701, 704, 336 N.Y.S.2d 620 (dissenting opinion), aff'd, 32 N.Y.2d 933, 300 N.E.2d 731 (memorandum restricted to facts), cert. denied, 414 U.S. 1045, 94 S. Ct. 551, 38 L. Ed. 2d 336; Oldham, "Questions of Exclusion and Exception Under Title VII—'Sex-Plus' and the BFOQ," 23 Hastings L.J. 55, 77–93; note, "Discrimination in Classified Advertising," 38 Albany L. Rev. 848. "While we recognize that the public's expectation of finding one sex in a particular role may cause some initial difficulty, it would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the sex discrimination was valid. Indeed, it was, to a large extent, these very prejudices the Act was meant to overcome." *Diaz* v. *Pan American World Airways, Inc.,* supra, 389. Neither the newspaper, nor the reader, nor even the

advertiser is prejudiced by the elimination of discriminatory advertising because it is apparent that a BFOQ must be self-evident from the very description or title of the occupation. We agree with the Supreme Court of New Jersey in *Passaic Daily News* v. *Blair,* supra, when it said at page 491: "Preliminarily, we respond to appellants' complaint that N.J.A.C. 13:11-1.3, prohibiting maintenance of sex-segregated columns, is defective in not providing an exception for a column consisting *solely* of positions lawfully restricted to a particular sex on the basis of . . . [BFOQ]. It may first be observed that in view of the narrowness of a . . . [BFOQ] the occasion for printing an entire newspaper column of legally permissible sex-preference job advertisements would be so rare as to be *de minimis.* But more importantly, the absolute rule prohibition is justified, under the public policy of the statute, for the reason that the publicized availability of sex-segregated columns in newspapers might encourage advertisers to attempt to evade the strict statutory limitations of permissible sex-preference expressions." (Emphasis in original.)

The plaintiffs claim that they should be allowed to offer sex classifications in help-wanted advertising where the employer is not precluded from discrimination under the terms of Connecticut law. In the first place, even if an employer is not precluded from engaging in discriminatory practices, a person (including a newspaper) is prohibited from aiding and abetting such *practices,* and not such employers. Secondly, any other interpretation would transform newspapers into regulatory arms of the state, requiring them to investigate and adjudicate whether the occupation listed met the stringent and narrow test circumscribed by the definition of BFOQ or whether

the employer is exempt from the act. Thirdly, the act protects citizens, namely prospective employees, and if an out-of-state employer wishes to advertise in this state in order to recruit employees in this state, newspapers published in this state must obey the laws of this state.

There is no error in either case.

In this opinion House, C. J., Loiselle and Bogdanski, Js., concurred.

MacDonald, J. (dissenting). I cannot agree with the majority opinion in either its reasoning, result or inherent philosophy. I find no evidence whatsoever in the record to support the finding that the plaintiffs in any way aided and abetted any violation of the unfair employment practices prohibited by the statute by making any independent judgment with respect to the placing of an advertisement under a particular heading nor, for that matter, can I find any evidence of specific discrimination against any individual which resulted from the method of advertising which is under attack.

At the calculated risk of being accused of male chauvinism, I must observe that I consider this particular controversy nothing more than a tempest in a teapot that raises such ridiculous overtones as to call for some equally ridiculous observations. I do not consider it discrimination, for example, but merely a convenience to job hunters, to place under a "Help Wanted Male" heading the advertisement of a carnival for a strong man, of the Pittsburgh Steelers for a linebacker, or of a dramatic producer for a Winston Churchill. I consider equally non-objectionable to a potential National Organization for Men the placing under a "Help Wanted Female"

caption the carnival's ad for a bearded lady, a night-club's ad for a topless dancer or the ad of a dramatic producer for a Lady Godiva or Cleopatra. And I shudder to contemplate the implications that might follow the nonclassified placing of the "Lonely Heart" ads!

Connecticut recently pioneered in overwhelmingly electing a woman as its chief executive purely on the basis of her qualifications for the position, and I applaud that equality of opportunity based upon qualification. By the same token I could even understand the acceptance of a qualified woman in response to an ad for a scoutmaster or of a qualified man as a den mother. However, some jobs remain which call for sex differentiation, even in these days when such differentiation has become increasingly difficult for the casual observer to discern—and differentiation is not discrimination. Accordingly, I see no reason why the so-called BFOQ (bona fide occupational qualification) exceptions should not be listed under separate male and female headings as a matter of reader convenience.

Differences of color, race, religious creed, national origin or ancestry are, basically, only skin-deep, but the differences between man and woperson, fortunately for the continued propagation of the huperson race, go somewhat deeper. And as the French person in the Chamber of Deputies once ecstatically cried, "Vive la difference!"