[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
FACTS
On March 2, 1990, Henry Gladstone filed an administrative charge of discrimination with the Commission on Human Rights and Opportunities (hereinafter "CHRO") alleging that General Dynamics Corporation, Electric Boat Division (hereinafter "EB") discriminated against him on the basis of his physical disability, Carpal Tunnel Syndrome (hereinafter "CTS") in violation of General Statutes 46(a) and 46a-60(a)(1). (Administrative Record, exhibit 1). Mr. Gladstone amended his charge of discrimination on March 19, CT Page 7023 1990 and then again on December 31, 1990. (Administrative Record exhibits 2, 3). On March 28, 1990 and January 9, 1991 EB filed its responses and several defenses to Mr. Gladstone's charge. (Administrative Record exhibit 4). After a hearing which was held on July 11, 1993 and continued on August 17, 1991, the hearing officer rendered a memorandum of decision on August 6, 1992 which was filed with the CHRO on August 7, 1992 and mailed to EB on August 13, 1992. In his memorandum of decision, the hearing officer found the following relevant facts:
1. All procedural prerequisites to a public hearing have been met.
2. Henry Gladstone worked at EB as a pipefitter from 1975 to 1978.
3. From 1981 to 1984 Mr. Gladstone worked for Lear-Seigler sanding helicopters which involved using pneumatic and manual sanding tools.
4. Mr. Gladstone was diagnosed as having possible CTS in 1984 by Doctor Thompson.
5. From 1984 to 1989 the complainant was not employed in a job which required repetitive hand motions or the use of pneumatic tools.
6. On May 24, 1989, Mr. Gladstone applied to EB for a position as pipefitter, second class.
7. On June 12, 1989, Mr. Gladstone filed a worker's compensation claim against Lear-Seigler alleging CTS work injury.
8. On August 3, 1989, Mr. Gladstone was informed by the foreman of EB's pipe shop, that he was hired as a second class pipefitter, subject to passing a physical examination.
9. On the same day, Mr. Gladstone was given a physical exam by EB's medical department and filled out a medical questionnaire.
10. On the medical form, Mr. Gladstone noted a "history" of CT Page 7024 four medical problems: a heart attack; an injury to his back and asthma, both related to prior employment with EB; and a "touch of carpal [sic] tunnel syndrome — mostly OK now — just checked July of 1989."
11. The physical exam administered by EB was quite lengthy — approximately two hours.
12. At no time during this exam was Mr. Gladstone asked any questions, or administered any tests, related to CTS.
13. On or about the day of the exam, Mr. Gladstone was told by a person at EB, whom he believed to be a nurse, that he had to obtain a methacholine challenge test, to determine if his asthma was cleared up, and to speak to his orthopedic doctor to determine if his prior back injury still required the imposition of lifting restrictions.
14. These were the only problems mentioned by EB personnel at that time, other than a possible need for reading glasses. Mr. Gladstone was told that if he got these two problems cleared up, he would be cleared for employment.
15. Mr. Gladstone took and passed the methacholine challenge test for which he paid $240.55.
16. Early in October of 1989, Mr. Gladstone reported to EB that his weight lifting restriction had been removed as well.
17. Some days later, on or about October 13, 1989, for the first time, a person from EB informed Mr. Gladstone that they had overlooked his prior history of CTS, and that because of that condition, he could not be hired.
18. Dr. Olmstead, EB's medical doctor during the relevant time period testified that he did not realize initially that Mr. Gladstone had indicated on this medical form that he had CTS.
19. On October 13, 1989, Mr. Gladstone was informed by EB that he would only be considered for work which did not involve the use of vibratory tools. Dr. Olmstead restricted Mr. Gladstone from all work involving CT Page 7025 "vibratory (pneumatic) tools," and from work involving repetitive hand motions. He classified Mr. Gladstone on that date from Class C (on hold pending medical clearance) to Class B (may be hired with certain restrictions).
20. Mr. Gladstone was told by a person from EB that he was not qualified for any position with EB, because they all required the use of pneumatic or vibratory tools.
21. On October 10, 1989, Mr. Gladstone provided EB with a form entitled "Connecticut Worker's Compensation Certificate of Acknowledgement of Physical Defect," on which it was noted that he had "mild left, minimal right bilateral carpal tunnel." Various neurological tests were appended to this form, the most recent of which is dated July 11, 1989, and which confirms a "mild carpal tunnel syndrome."
22. Dr. Thompson, a neurologist who treated Mr. Gladstone, concluded in July, 1989 that Mr. Gladstone had a mild case of bilateral CTS.
23. Dr. Thompson testified by deposition that given the mild nature of Mr. Gladstone's condition, he saw no reason to impose work restrictions on him.
24. Dr. Thompson spoke with Dr. Carr, of EB's medical office, on November 22, 1989.
25. Dr. Thompson wrote a note on January 29, 1990, reiterating that Mr. Gladstone's condition did not require work restrictions. Mr. Gladstone gave this note to EB's personnel department.
26. Dr. Olmstead testified that anyone with a history of any CTS would be restricted, as was Mr. Gladstone, even if the person's own physician believed that the person could work without restrictions.
27. The only reason Dr. Olmstead restricted Mr. Gladstone was because he suffered from CTS.
28. Dr. Thompson testified that CTS is a condition involving the compression of the median nerve of the wrist, CT Page 7026 sometimes caused by repetitive movement of the wrist, which results in a thickening of the ligament across the wrist, which, in turn, results in a compression, or pinching, of the nerve. Dr. Browning, EB's expert orthopedist, concurs in this description.
29. Symptoms of CTS include a tingling sensation in the thumb and two adjacent fingers, a burning sensation in these digits, pain in the palm of the hand, and, if untreated, an eventual weakening in the grasp of the hand.
30. The condition is initially treated with wrist splints; surgical decompression, by cutting the ligament, is an option if the condition does not resolve with splints.
31. Dr. Thompson, who has treated many persons with CTS in his practice, testified that it is impossible to predict that a person displaying mild carpal tunnel syndrome symptoms will worsen if continuously exposed to repetitive wrist motion. In some cases, a few weeks of using wrist splints will cause the symptoms to abate permanently. One cannot conclude that a repetitive hand motion will aggravate the symptoms. Sometimes a job modification will alleviate the symptoms.
32. Dr. Browning testified that, in his experience, one who has exhibited CTS symptoms, and who continues to work with repetitive hand motions, will generally experience a worsening of the condition. On the other hand, some persons may not experience a worsening of symptoms.
33. Surgical decompression will usually alleviate the symptoms about 95% of the time, provided the symptoms have not persisted so long as to cause atrophy of the hand muscles.
34. There is simply too much individual variation to make a prediction that a particular repetitive wrist motion will aggravate the condition.
35. Dr. Thompson believes that use of vibratory tools is not a factor in white finger disease. Mr. Gladstone did not have white finger disease.
36. Dr. Browning testified a good deal about white finger CT Page 7027 disease, and, although Mr. Gladstone did not have white finger disease, Dr. Browning testified that he would still keep Mr. Gladstone away from vibrating or pneumatic tools because he had already used them in prior employment.
37. Dr. Browning testified that, if the only evidence of CTS was the patient's statement that he had a mild case of it, it would be appropriate to investigate the patient's past history before imposing medical restrictions.
38. The grinding done by pipefitters today at EB (requiring the use of vibratory tools and repetitive hand motion) is incidental, according to a personnel representative of EB.
39. Approximately 40% of a pipefitter's time involves working with his or her hands, which may include the use of various tools, including pneumatic tools.
40. During this hand work, a pipefitter would do various things, such as cleaning pipe, cutting pipe, positioning pipe, incidental grinding to pipe and joining pipe. Some of this work requires that use of tools, while some does not; some requires various repetitive hand motions, and some does not.
The hearing officer examined the above stated findings of fact and determined, in his memorandum of decision, that EB based its decision not to hire Mr. Gladstone solely on the ground that he had CTS. The hearing officer determined further that EB's bona fide occupational qualification (hereinafter "BFOQ") defense failed because he found that EB had not proven that every individual suffering from CTS is unable to perform the tasks required of any of the jobs for which Mr. Gladstone applied. Furthermore, the hearing officer found that he need not examine EB's BFOQ defense as applied to Mr. Gladstone personally because he found that there was no credible evidence to indicate that EB evaluated Mr. Gladstone with respect to the jobs for which he applied.
The hearing officer then awarded Mr. Gladstone back pay from the date the discriminatory act occurred to the first day of the hearing. The hearing officer further CT Page 7028 ordered EB to offer Mr. Gladstone a job as pipefitter, 2nd class with no accrued seniority conditioned upon a physical examination which shall determine in addition to everything normally done whether the complainant's CTS prevents his hiring as a BFOQ.
On September 23, 1992, EB filed a timely appeal from this decision. EB argues that the following items contained in the hearing officer's decision are erroneous and unsupported by the evidence: 1) the analysis of EB's BFOQ or need defense; 2) the analysis of EB's "safety" defense; 3) the factual findings with respect to the medical experts' testimony and opinions; 4) the factual findings with respect to the restrictions imposed; 5) the factual findings with respect to the duties and functions of the jobs applied for and for which Mr. Gladstone was qualified; 6) the factual finding with respect to Nurse Gelinas' testimony; and 7) the factual and legal findings wherein he found and ruled that Mr. Gladstone could be sufficiently disabled to collect a $6,000 workers' compensation settlement for CTS and at the same time be "otherwise qualified" to work an intensely hand repetitive job is erroneous as a matter of law and not supported by the evidence.
The CHRO filed an answer and counterclaim on November 9, 1992. In its counterclaim, the commission asserts that the hearing officer's decision to grant back pay only to the first date of the hearing is contrary to law and the evidence.
Both parties filed briefs in support of their positions.
AGGRIEVEMENT
"The commission on human rights and opportunities, any respondent or any complaint aggrieved by a final order of a presiding officer or any complainant aggrieved by the dismissal of his complaint by the commission may appeal therefrom in accordance with section 4-183. . . ." General statutes 46a-94a(a). Aggrievement is established if there is a possibility that some legally protected interest has been adversely affected. Light Rigging Co. v. Department of Public Utility Control, 219 Conn. 168, 173, 592 A.2d 386
(1991). CT Page 7029
The hearing officer found that EB, the respondent, had discriminated against Mr. Gladstone, and among other things ordered it to pay Mr. Gladstone back wages in the excess of $22,000. The court finds that EB is aggrieved by the hearing officer's decision.
SCOPE OF REVIEW
The trial court's review of an administrative agency's decision is limited in scope and is governed by the Uniform Administrative Procedures Act (UAPA). See Connecticut Light Power v. Department of Public Utility Control, 219 Conn. 51, 57-58, 591 A.2d 1231 (1991). Under General Statutes 4-183(g) the court must sustain an agency's decision if it is supported by substantial evidence and the determination of issues of fact by the administrative agency should be upheld if the record before the agency affords a substantial basis of fact from which the fact in issue can be reasonably drawn. Miko v. Commission on Human Rights 
Opportunities, 220 Conn. 192, 200-01, 596 A.2d 396 (1991). In making this determination, the court must "defer to the agency's assessment of the credibility of the witnesses." (Citations omitted). Id., 200.
Regarding conclusions of law, the court's ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. Connecticut Light Power, supra, 57-58. If any reasons support the agency's decision, the decision must be upheld. Griffin Hospital v. Commission on Hospitals and Health Care, 200 Conn. 489, 498, 512 A.2d 199
(1986).
DISCUSSION
General Statutes 46-60 provides that:
 (a) It shall be a discriminatory practice in violation of this section:
 (1) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual CT Page 7030 . . . because of the individual's . . . physical disability, including but not limited to blindness;. . . .
A person has a physical disability under the above statute if the individual has "any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness . . . ." General Statutes 46a-51(15). It is not disputed that CTS is a physical disability within the definition of General Statutes 46a-51(15).
In its brief, EB argues that the hearing officer's decision is contrary to law because: 1) he applied the wrong legal standard when reviewing EB's BFOQ defense; 2) the hearing officer's factual findings with respect to the medical experts' testimony are erroneous and are not supported by the evidence; and 3) he either ignored EB's safety defense or applied the wrong legal standard.
As issues which are not briefed are abandoned; State v. Ramsundar, 204 Conn. 4, 16, 526 A.2d 1311 (1987); the court will consider only those issues which were briefed by EB.
I. The proper legal standard.
In Connecticut Institute v. Commission on Human Rights Opportunities, 176 Conn. 88, 93, 405 A.2d 618
(1978), the court stated:
 "The scope of a `bona fide occupational qualification' as a defense to a complaint of discrimination depends in part upon the reason advanced for the allegedly discriminatory conduct. Some job disqualifications arise out of employment criteria, such as intelligence tests, which are neutral on their face but have a disproportionate impact on protected classes of workers. Such disqualifications come within the holding of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Evening Sentinel v. National Organization CT Page 7031 for Women, 168 Conn. 26, 36-37, 357 A.2d 498 (1975); Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, 482 F.2d 1333, 1337 (2d Cir., 1973); these disqualifications are valid if, despite their admittedly adverse impact, they bear a significant relationship to successful job performance. Other job disqualifications are not facially neutral but directly disqualify on the basis which is made a suspect classification by the terms of Connecticut's Fair Employment Practices Act. . . such disqualifications are only justified by bona fide occupational need, an exception described in Evening Sentinel v. National Organization for Women, supra, 38, as `stringent and narrow.'"
Where there is overt discrimination, the blanket disqualification of the class is a bona fide occupational qualification if the employer demonstrates that "no member of the class excluded is physically capable of performing the tasks required by the job." Evening Sentinel v. National Organization for Women, 168 Conn. 26, 36, 357 A.2d 498
(1975).
However, where the discrimination is not overt, the burden is on the complaining party to prove a prima facie case of discrimination. Board of Education v. Commission on Human Rights Opportunities, 176 Conn. 533, 409 A.2d 1013
(1979). In this instance, the court must apply the analysis laid out in McDonnell Douglas[1] to determine if the employer has in fact discriminated against a suspect class. Id., 537. "The McDonnell Douglas analysis is `[i]ntended progressively to sharpen inquiry into the elusive factual question of intentional discrimination,' where the plaintiff's case is made out with circumstantial evidence supporting the inference of discrimination." (Emphasis in original and citations omitted.) Commission on Human Rights and Opportunities, ex rel. Samuel Tucker v. General Dynamics Corporation Electric Boat Division, 7 CSCR 62 (January 13, 1992, Axelrod, J.). Once the complaining party has established a prima facie case of discrimination under the CT Page 7032 McDonnell Douglas test, the burden then shifts to the employer to articulate a legitimate nondiscriminatory reason for its conduct. Board of Education v. Commission on Human Rights and Opportunities, supra, 537.
EB argues that the hearing officer erroneously applied the standard for overt discrimination. EB argues, in it memorandum, that although EB's doctor preliminary imposed repetitive hand motions and vibratory tool use restrictions upon Mr. Gladstone on the basis of his written statement that he had a "touch of CTS," the ultimate decision to restrict Mr. Gladstone was based on an individualized assessment of his CTS condition. In support of this contention, EB points to evidence presented that EB's Doctor communicated with Mr. Gladstone's personal doctor, Dr. Thompson regarding Mr. Gladstone's condition. Specifically, EB points to a report issued by Dr. Thompson wherein he states that Mr. Gladstone's CTS has "waxed and waned" in the past depending on the type of job Mr. Gladstone held. (Joint exhibit 5). EB also points to the deposition testimony of Dr. Browning, an expert in CTS and White Finger Disease, in which he determines that, given Mr. Gladstone's background of CTS "waxing and waning," Mr. Gladstone's condition would get worse if exposed to vibrating tools or tools requiring repetitive use. (Deposition testimony of Dr. Browning, p. 23). EB contends that "[w]hen the revelant testimony of Dr. Browning is considered, it is clear that EB's Dr. Olmstead was justified in recommending the medical restrictions that he did ("No vibratory (pneumatic) tools, — no work involving repetitive hand motion") based upon the reasonable probability of imminent injury to Mr. Gladstone individually if he were hired into the pipefitter job." (EB's brief, pages 10-11).
The hearing officer specifically found that: as "Electric Boat imposed these restrictions on Gladstone, irrespective of his own individual condition, it is not necessary to reach the question the BFOQ defense as applied to him. There is no credible evidence to indicate that Electric Boat evaluated Gladstone's condition with respect to the jobs applied for. The discriminatory act of placing restrictions on his job application was caused by his admitting "a touch of carpal [sic] tunnel syndrome" on his job application. (Hearing officer's memorandum of decision page 18.) CT Page 7033
The hearing officer's determination that EB did not assess Mr. Gladstone's condition as it related to the jobs for which he applied is a factual determination supported by the following evidence: 1) Dr. Thompson did not place restrictions on Mr. Gladstone (Deposition testimony of Dr. Thompson, p. 43); 2) the medical staff at EB did not perform any examinations on Mr. Gladstone regarding his CTS (Transcript of hearing, July 11m 1991, pages 45, 46); and 3) EB had a policy of restricting anyone with CTS regardless of the seriousness and regardless of the treating physician's opinion. (Deposition testimony of Dr. Olmstead, pages 44, 45).
EB argues that the hearing officer placed undo significance on the fact that Dr. Thompson did not place restrictions on Mr. Gladstone. This fact is not relevant to Mr. Gladstone's condition, EB argues, because Dr. Thompson testified that he usually left the decision of what restriction should be placed on an individual up to the employers doctor. (citation). However, the significance of Dr. Thompson not restricting Mr. Gladstone is relied upon by the hearing officer to support the contention that Mr. Gladstone should not be restricted, as EB contends, but it is used to support the hearing officer's finding that EB did not make an individual assessment of Mr. Gladstone before replacing restrictions upon him.
Accordingly, the court finds that there is substantial evidence in the record to support the hearing officer's determination that EB did not make an individual assessment of Mr. Gladstone's CTS condition and yet refused to hire Mr. Gladstone because of his physical disability, CTS. Therefore, the hearing officer applied the appropriate test.
II. The hearing officer's factual findings with respect to the medical experts' testimony and opinions.
EB next argues that the hearing officer erred by focusing on CTS in general rather than Mr. Gladstone's individual CTS condition. EB argues that the hearing officer completely ignored evidence which tended to establish that Mr. Gladstone's individual CTS condition was such that aggravation was almost guaranteed if he were exposed to repetitive hand motion. However, because the hearing officer CT Page 7034 found that this is a case of overt discrimination, which finding is supported by substantial evidence in the record, then the proper focus of the hearing officer's inquiry was whether any person suffering from CTS could perform the duties required of the job at issue. See Connecticut Institute for the Blind v. CHRO, 176 Conn. 88, 405 A.2d 618
(1978). The hearing officer conducted such an inquiry and determined that EB had not met this burden. In fact, EB states in its brief: "The hearing officer correctly found that there is `too much individual variation to make a prediction as to what activities will aggravate CTS.'" (EB's brief, 8).
III. EB's safety defense.
Finally, EB argues that the hearing officer's decision is erroneous and contrary to law because he either ignored EB's safety defense or applied an improper legal standard. Citing to federal case law, EB argues that the safety defense provides that an employer is not required to hire someone into a job where there is a reasonable probability of imminent and substantial harm to the employee or to others.
In his decision, the hearing officer states:
 The effects of CTS (carpal tunnel syndrome) on Gladstone at the time of his application for work in May of 1989 were mild. From the evidence presented this trier of fact could not determine the use of pneumatic or other vibratory tools would exacerbate Gladstone's CTS. Such a result is certainly possible but not inevitable. (Hearing officer's memorandum of decision, page 15).
General Statutes 46a-60(a)(1), while it provides an employer with a BFOQ defense, does not refer to what EB deems a "safety defense." However, as is aptly pointed out by the CHRO a "safety defense" may be inherently part of an employer's BFOQ defense.
The defense has been implicitly addressed in the above discussion. As the hearing officer found that EB did CT Page 7035 not make an individual assessment of Mr. Gladstone, and that EB did not prove that all those inflicted with CTS could not perform the tasks required of the jobs for which Mr. Gladstone applied, then it follows that EB did not prove its safety defense.
IV. CHRO's counterclaim.
The CHRO filed a counterclaim in which it argues that the hearing officer erred in his calculations of back pay. The hearing officer ordered back pay from the date the discriminatory conduct occurred to the date of the hearing. The CHRO asserts that the hearing officer should have ordered back pay to the date of the hearing officer's decision which he issued more than one year after the hearing.
The court "on appeal shall also have jurisdiction to grant to the commission, respondent or complainant such temporary relief . . . as it deems just and suitable, and in like manner to make and enter a decree enforcing or modifying and enforcing as so modified or setting aside, in whole or in part, the order sought to be reviewed." General Statutes46a-94a(a).
Therefore, the court has the jurisdiction and the discretion, to modify the hearing officer's order to require EB to pay Mr. Gladstone back wages to the date of the issuance of the hearing officer's decision. The court deems such relief just and suitable and, therefore, awards back wages to the date of the hearing officer's decision.
CONCLUSION
The court concludes that the hearing officer's finding, that EB did not hire Mr. Gladstone because of his physical disability without first having assessed his individual condition, is supported by substantial evidence. It is further concluded that the hearing officer applied the correct legal standard when reviewing EB's BFOQ defense. Accordingly, EB's appeal is hereby denied.
The court may make any modifications of the hearing officer's order as it deems just and suitable.
The CHRO's claim regarding back pay is hereby CT Page 7036 granted as stated previously.
Hurley, J.