[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. STATEMENT OF THE CASE
This matter involves an appeal by the Commission on Human Rights and Opportunities ("CHRO") from a decision of one of its hearing officers, the defendant, John R. Flores ("Presiding Officer"). Said appeal is brought pursuant to General Statutes § 46a-94a, which authorizes the CHRO to appeal final orders of its presiding officers in which it has been aggrieved.
II. PROCEDURAL HISTORY
The complainants, Alfred Simonelli ("Simonelli"), Darin Reels ("Reels"), and John O'Brien ("O'Brien") filed, on July 5, 1983, May 23, 1984, and December 6, 1985, respectively, administrative charges of discrimination with the CHRO, alleging that the defendant, General Dynamics Corporation, Electric Boat Division ("EB"), had discriminated against them on the basis of their hearing disabilities, in violation of General Statutes § 46a-60(a)(1).[1] Record: #1, Decision of Presiding Officer, dated June 19, 1992 ("Presiding Officer's Decision"), at 2.
On July 27, 1990, the three complaints were consolidated and, on July 31, 1990, the Presiding Officer was appointed to resolve the issues raised therein. Id., at 3. Public hearings were held on December 17-18, 1990, January 29-30, 1991, March 5-6, 1991, April 10, 1991, May 29, 1991, June 26, 1991, July 15, 1991, and August 27, 1991. Id., at 3. On June 25, 1992, the Presiding Officer's Decision was mailed to the parties. Petition of the CHRO, filed September 30, 1992, at 3-4.
In his decision, the Presiding Officer found the following relevant facts proven by a preponderance of the evidence:
1. The complainants Simonelli, Reels, and O'Brien CT Page 4551 have a physical disability caused by a hearing impairment of different degrees. They applied for employment with EB and were rejected.
 2. Approximately 20% of . . . EB's present workforce have hearing impairments which would prevent them from being hired if they were applying today for their positions. Record: #2, Transcript, at 212.
 3. Mr. Simonelli applied for an inside machinist position with EB in December, 1982 and March, 1983. Record: #6, Transcript, at 1074-84; #28, CHRO Exhibit 12, Documents from EB, at 1-6. On April 5, 1983, EB offered to hire Simonelli as an inside machinist if he passed a physical exam. Record: #6, Transcript, at 1084; #28, CHRO Exhibit 12, Documents from EB, at 24, 26. At the time he applied, Simonelli had over thirty years experience as a machinist. Record: #6, Transcript, at 1074.
 4. Mr. Simonelli underwent and failed a hearing exam. Record: #28, CHRO Exhibit 12, Documents from EB, at 21. EB calculated Mr. Simonelli's binaural hearing loss as 5.83% pursuant to a formula developed by . . . [EB]. Mr. Simonelli's hearing impairment rendered him ineligible for employment in a noise hazardous work area. Record: #3, Transcript, at 320-21.
 5. EB denied Mr. Simonelli employment as an inside machinist as a result of his hearing impairment.
 9. Mr. O'Brien applied for a forklift operator position with . . . [EB] in July and September, 1985. Record: #5, Transcript, at 686-87; #26, CHRO Exhibit 10, Documents from EB. On October 9, 1985, EB offered to hire O'Brien as a forklift operator if he passed a physical exam.
 10. O'Brien underwent and failed a hearing exam. Record: #5, Transcript, 690-91; #26, CHRO Exhibit 10, Documents from EB, at 19. Utilizing its formula, EB calculated O'Brien's hearing loss as 5.42%. Record: #26, CHRO Exhibit 10, Documents CT Page 4552 from EB. O'Brien's hearing impairment rendered him ineligible for employment in a noise hazardous work area. Record: #3, Transcript, at 387.
 11. EB denied O'Brien employment as a forklift operator as a result of his hearing impairment.
 12. As a result of an inspection of the shipyard by OSHA, the agency required the establishment of a Hearing Conservation Program. Record: #2, Transcript, at 110.
 13. Jay Hans was hired by EB to establish a Hearing Conservation Program which was implemented in Spring, 1982. This program was established pursuant to the Hearing Conservation Amendment, 29 C.F.R. § 1910.95. There are five primary elements to this program: (1) identify noise hazardous areas; (2) post notices in those areas in excess of 85 decibels; (3) provide hearing protection to employees working in a noise hazardous environment; (4) conduct annual hearing tests; and (5) education and discipline requirements. Record: #2, Transcript, at 112-17; #4, Transcript, at 415-19; #140, EB's Exhibit B, 29 C.F.R. — Occupational Safety Health Administration's Occupational Noise and Hearing Compensation Amendment.
 14. The intensive audiological evaluation used by EB to determine the site of the lesion of the hearing loss is not required by the Hearing Conservation Program regulations. Record: #2, Transcript, at 117-18.
 15. Hearing protection is mandatory for work performed in noise hazardous areas (over 85 decibels) pursuant to 29 C.F.R. § 1910.95. Record: #4, Transcript, at 416; #140, EB's Exhibit B, 29 C.F.R. — Occupational Safety Health Administration's Occupational Noise and Hearing Compensation Amendment.
 16. During the hearing exam conducted by Jay Han's office, a screening test is given to measure the candidate's ability to hear frequencies between CT Page 4553 500 — 8,000 hertz. If the person's hearing threshold is greater than 25 db from 500 to 2,000 hertz or greater than 30 db from 3,000 — 8,000 hertz, in either ear, then the applicant fails the test. The individual would be required to obtain a complete audiological exam. If the person's hearing threshold is 25 db or less from 500 — 2,000 hertz or 30 db or less from 3,000 — 8,000 hertz, in both ears, then the person would pass the hearing exam and could be employed at EB without restriction with respect to hearing requirements. Record: #2, Transcript, at 118-26, 130-32; #4, Transcript, at 448-53.
 17. The audiological exam is compared to the initial screening test to ensure consistent results. Jay Hans uses these results to determine the bone conduction or sensory neural portion of the hearing loss according to the formula developed by EB. Record: #2, Transcript, at 123-24; #3, Transcript, at 273; #4, Transcript, at 452-53.
 18. EB's formula appears in CHRO exhibit 9 and was derived from previously existing formulas developed in various organizations. These entities use different formulas. Record: #2, Transcript, at 134-37; #11, Transcript, at 61-66.
 19. Jay Hans developed cutpoints with respect to EB's formula. The first cutpoint was 1.1 and it was in effect from approximately 1983-1988. The second cutpoint of 3.0 has been in effect since 1988. The cutpoints were used to determine which persons could be placed in jobs which required work in noise hazardous areas. Record: #2, Transcript, at 137-38, 158-60, 172; #4, Transcript, at 458.
 20. Jay Hans changed the 1.1 cutpoint to 3.0 in 1988 because he determined the 1.1 mark was overly restrictive. Record: #3, Transcript, at 159-60.
 21. EB's hearing impairment formula measured only sensory neural hearing loss; conductive losses were discounted by the formula. Record: #4, Transcript, at 448-53. CT Page 4554
 22. EB relied on noise surveys to determine which area of the shipyard had to [be] posted as noise hazardous. These surveys, however, were not done on an annual basis. There were a number of departments/work areas which were posted as noise hazardous even though a mechanically recorded survey had not been done for years. Some noise data produced in Exhibit V was taken in 1981 and was used to exclude applicants in subsequent years.
 23. EB does not require a hearing test for employees who transfer from one position to another job. In 1988, approximately 95 inside machinists were permitted to transfer to outside positions without first undergoing hearing tests. Record: #2, Transcript, at 94-95; #12, Transcript, at 238-39.
 24. The hearing tests were not used to determine whether current employees can still perform their job tasks without posing a safety threat to coworkers. Record: #2, Transcript, at 210.
 25. Under the EB policy, an employee who worked in a job, quit and then reapplied for the same position after one year would be required to undergo the hearing test. If this person failed the test, he or she would not be hired. Record: #4, Transcript, at 615-17.
 28. The ability to localize and lateralize sound is important for the safe operation of forklifts at the EB shipyard. Record: #4, Transcript, at 540.
After examining the above stated findings of facts, as well as the other evidence previously presented, the Presiding Officer first concluded that EB "had a blanket policy of excluding all applicants who failed to meet the appropriate threshold tests of 3.0 or 1.1"; record: #1, Presiding Officer's Decision, at 15; and that such use of the blanket policy constituted "overt evidence of discrimination." Id., at 16. Additionally, the Presiding Officer concluded that "[a]lthough each applicant was individually tested to determine [his] hearing, this testing cannot be considered an individual evaluation of a candidate's qualifications for a CT Page 4555 job," because "[t]he individualized assessment was only to determine on which side of the cutoff . . . the complainant's audiological results" fell. Id., at 15. In this regard, the Presiding Officer further concluded that "[t]he exam was given to determine each individual candidate's standing with respect to the application of a blanket policy," and that "[n]o further truly individualized assessment occurred with respect to two of the three [c]omplainants."
Next, the Presiding Officer concluded that the bona fide occupational qualification ("BFOQ") defense specifically provided for by General Statutes § 46a-60(a) did not apply to the matter before him, in light of the fact that EB had conceded its failure to prove that no member of the excluded class was physically capable of performing the required job tasks. Id., at 17-18.
Thereafter, the Presiding Officer considered the so-called "safety defense" set forth by EB, who argued that the complainants were not excluded from employment simply because their results on the hearing tests were on the wrong side of the formula; rather, they were also excluded from employment because an individualized assessment of the complainants' qualifications indicated that they were unable to safely perform the jobs for which they had submitted applications. Id., at 18. However, because the Presiding Officer determined that EB had failed to establish sufficient evidence "that atthe time the rejection decision was made, there existed legitimate, nondiscriminatory business reasons for the refusal to hire" Simonelli and Reels; id., at 18; the Presiding Officer concluded that EB had unjustifiably discriminated against them.
Consequently, EB was ordered to provide Simonelli and Reels with the next available positions as an inside machinist and painter, respectively. Id., at 27-28. Additionally, the Presiding Officer ordered backpay for both Simonelli and Reels. With respect to Simonelli's damages, the Presiding Officer adopted EB's wage analysis with the following modifications: no backpay for 1986 to the present, because Simonelli earned more outside EB than he would have received had he worked at EB during this time period. Therefore, EB was ordered to pay Simonelli $27,500 in back pay, $1,884.85 in medical costs, interest at the legal rate, reasonable attorney fees, and to provide accrued seniority with CT Page 4556 appropriate pension credit. Id., at 27. Damages for emotional distress were not awarded by the Presiding Officer to either Reels or Simonelli. Id., at 28.
As to O'Brien's claim of discrimination, the Presiding Officer declined to find liability on the part of EB, on the ground that EB had legitimate safety concerns regarding O'Brien, which justified its failure to hire him. Id., at 25-26. In this regard, the Presiding Officer found that:
 Unlike the other two, his job as a forklift driver required him to be more mobile and travel throughout the shipyard. He has to have the ability to react to changing circumstances especially in light of the fact his forward view is frequently blocked by the material he is transporting. [EB]'s experts Hans and Dr. LaCroix stated O'Brien's condition affected his ability to localize and lateralize sound which is critical for the safe operation of a forklift in the shipyard. Hans indicated apart from the application of the blanket policy, he would not have recommended O'Brien for placement based on his inability to localize and lateralize sound. This assessment was confirmed by Dr. LaCroix. The evidence shows accommodation for the forklift position was not possible.
Based on the foregoing, the Presiding Officer concluded that "although the hearing test policy is invalid, [EB] has a legitimate reason for rejecting O'Brien," because "EB has met its burden of proof with respect to legitimate safety concerns arising out of a person's difficulty in localizing sound while driving a forklift."
Id., at 25-26. Accordingly, O'Brien's complaint was dismissed. Id., at 28.
On July 23, 1992, the CHRO and Simonelli filed a Motion for Rehearing with the Presiding Officer. On August 25, 1992, the Presiding Officer issued an order clarifying his earlier decision, stating that "Mr. Simonelli is to be reinstated to the position he originally applied for at Electric Boat," and that, "[o]nce reinstated, accumulated seniority may entitle him to a higher grade position." As to all remaining issues, CT Page 4557 however, the Motion for Rehearing was denied.
Thereafter, on September 30, 1992, the CHRO filed a Petition with this court, requesting that its appeal be sustained and that the court modify the decision of the Presiding Officer and/or order the Presiding Officer to take such action as may be required by law to effect the particular action ultimately taken by the court. In said petition, the CHRO alleges that the decision of the Presiding Officer violates General Statutes § 4-183 for a number of reasons, each of which is discussed in detail below. Subsequently, on November 20, 1992, EB filed an Answer to the CHRO's Petition. Both parties have filed briefs in support of their respective positions.
III. DISCUSSION
 A. Aggrievement
Pursuant to General Statutes § 46a-94a(a), "[t]he commission on human rights and opportunities, any respondent or any complainant aggrieved by a final order of a presiding officer . . . may appeal therefrom in accordance with § 4-183. . . ." Aggrievement is established if there is a possibility that some legally protected interest has been adversely affected. Light Rigging Co. v. Department of PublicUtility Control, 219 Conn. 168, 173, 592 A.2d 386 (1991). The court finds that the CHRO is aggrieved under this statute.
B. Standard of Review
A trial court's review of an administrative agency's decision, which is governed by the Uniform Administrative Procedures Act ("UAPA"), is limited in scope. See ConnecticutLight Power Co. v. Department of Public Utility Control,219 Conn. 51, 57-58, 591 A.2d 1231 (1991). Regarding questions of fact, the court need only determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact, and whether the conclusions drawn from those facts are reasonable. Id., 57. "Substantial and competent evidence is that which carries conviction. It is such evidence as a reasonable mind might accept as adequate to support a conclusion. It means something more than a mere scintilla and must do more than create a suspicion of the existence of the fact to be CT Page 4558 established." (Citations omitted; internal quotation marks omitted.) Board of Education v. CHRO, 176 Conn. 533, 538,409 A.2d 1013 (1979).
The court may not substitute its judgment for that of the agency as to the weight of the evidence or questions of fact.Lieberman v. Board of Labor Relations, 216 Conn. 253, 262,579 A.2d 505 (1990). Thus, "[i]n determining whether an administrative finding is supported by `substantial evidence,' a reviewing court must defer to the agency's assessment of the credibility of the witnesses and to the agency's right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part. . . ." (Citation omitted; internal quotation marks omitted.) ConnecticutBuilding Wrecking Co. v. Carothers, 218 Conn. 580, 593,590 A.2d 447 (1991). "Ultimately, the question is not whether the trial court would have reached the same conclusion but whether the record before the [agency] supports the action taken." (Citation omitted; internal quotation marks omitted.) Miko v.CHRO, 220 Conn. 192, 201, 596 A.2d 396 (1991).
As to claimed errors of law, however, the court has the responsibility of ensuring that the law has been correctly applied. Thus, while the court may not retry the facts, if ". . . the issue is one of law, the court has the broader responsibility of determining whether the administrative action resulted from an incorrect application of the law to the facts found or could not reasonably or logically have followed from such facts." United Parcel Service, Inc. v.Administrator, 209 Conn. 381, 385, 551 A.2d 724 (1988).
C. EB's Failure to Hire O'Brien
The CHRO first alleges that the Presiding Officer erred by failing to find that EB discriminated against O'Brien because of his hearing disability, in violation of General Statutes § 46a-60(a)(1), because he improperly assessed the testimony of certain witnesses. Specifically, the CHRO argues that the Presiding Officer:
 (1) erred to the extent that he framed his conclusion by weighing the credibility of Mr. Hans and Ms. Cornell, because Mr. Hans did not testify regarding EB's ability or inability to accommodate O'Brien's condition, and, in the absence of such CT Page 4559 testimony, Ms. Cornell's testimony should not have been discounted without affirmative evidence to the contrary;
 (2) erred in discounting the testimony of Ms. Cornell on the ground that she was not familiar with EB's work environment, because EB failed to dispute the essential portion of her testimony that it was possible to normalize O'Brien's hearing with the use of a hearing device that would enable him to achieve bilateral hearing; and
 (3) erred in wrongly discounting or failing to acknowledge the testimony of Mr. Vinci, who is familiar with EB's work environment, who testified that he has trained forklift drivers who have far worse hearing than O'Brien, and who work in equally noisy areas. The Presiding Officer made no mention of Mr. Vinci's testimony, which supports and is consistent with Ms. Cornell's.
"It is the hearing officer's prerogative to assess the credibility of the witnesses and believe or disbelieve any evidence presented." (Citation omitted.) Levy v. CHRO,35 Conn. App. 474, 489, 646 A.2d 893 (1994). Thus, findings of fact, or failures to find a fact, based on assessments of witness credibility, should not be disturbed on appeal. SeeConnecticut Light Power Co. v. Department of Public UtilityControl, 216 Conn. 627, 639-40, 583 A.2d 906 (1990). This is true, moreover, "even where the administrative record contains uncontradicted testimony as to the existence of a given fact, [because] the [Presiding Officer's] failure to find that fact must be understood as a discretionary decision not to believe or accept the testimony of the witness instead of an abuse of its sound discretion." Fenn Mfg. Co. v. CHRO, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 509435 (February 8, 1994, Sheldon, J.), at 39. The Presiding Officer is in a far better position than this court to assess the credibility of the witnesses, and the consequent weight to be given their testimony. Accordingly, the court declines to sustain the CHRO's appeal on the basis of the three grounds articulated above.
Next, the CHRO alleges that the Presiding Officer erred by failing to find that EB discriminated against O'Brien CT Page 4560 because of his hearing disability, in violation of General Statutes § 46a-60(a)(1), because:
 (1) his conclusion, that the evidence showed that accommodation for the forklift position O'Brien sought was not possible, is not supported by the evidence of record and violates the rule announced in Miko v. CHRO, [supra], that the respondent may not rely upon a reason not articulated at the time the discriminatory act was performed;
 (2) he failed to appreciate that it was EB and not the CHRO which had the burden of proving that it was unable to accommodate O'Brien;
 (3) the evidence does not support his conclusion that O'Brien could not be accommodated, and in fact supports the conclusion that EB never considered the issue of accommodation at the time the decision was made not to employ O'Brien; and
 (4) he wrongly found, as a matter of law, that the so called "safety defense" under a wholly unrelated and overly restrictive federal law is available as a defense in an action under Connecticut antidiscrimination law.
In response, EB argues that, although the hearing impairment formula cutoff point was determined by the Presiding Officer to be unlawful and in violation of General Statutes § 46a-60(a)(1), because it was an "overinclusive" blanket policy, the Presiding Officer specifically found that "it is entirely probable [that] there is some number whereby every applicant on the wrong side of the cutpoint cannot perform or safely perform any noise hazardous job." Record: #1, Presiding Officer's Decision, at 18. This is a critical distinction, EB argues, because the CHRO's assertion, that once the blanket policy/formula cutpoint was found unlawful it necessarily follows that all three complainants — including O'Brien — were unlawfully refused placement in the applied for noise hazardous jobs, is simply not true. Rather, EB argues, because there was credible testimony that O'Brien would have been rejected even if he had come out on the right side of the formula cutpoint, because of the fact that he was a monaural hearing person and, as such, could not safely operate a CT Page 4561 forklift in EB's noise hazardous shipyard, the Presiding Officer properly concluded that O'Brien was lawfully refused employment. In this regard, EB argues that the issue of whether EB is liable to O'Brien for refusing him employment is governed by the "mixed motives" standard established by the United States Supreme Court in Price Waterhouse v. Hopkins,490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and adopted by the Connecticut Supreme Court in Miko v. CHRO,
supra, 220 Conn. 192, and the Connecticut Appellate Court inLevy v. CHRO, supra, 35 Conn. App. 474.
Additionally, EB argues that the Presiding Officer's analysis and application of the so-called "safety defense" to O'Brien was proper, and is fully supported by the record. In this regard, EB argues that "whether you call it the `safety defense' or not, . . . there cannot be any discrimination unless a job applicant is otherwise `qualified' . . . to perform the essential functions of the job," which the Presiding Officer found that O'Brien was not. EB's Brief, filed October 17, 1994, at 7.
General Statutes § 46a-60 provides, in pertinent part, that:
 (a) It shall be a discriminatory practice in violation of this section:
 (1) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual . . . because of the individual's . . . physical disability. . . .
A person has a physical disability under the above statute if the individual has "any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to . . . hearing impairment. . . ." General Statutes § 46a-51(15). It is not disputed that the hearing loss suffered by O'Brien constitutes a physical disability within the definition of General Statutes § 46a-51(15). What is in dispute, however, is whether the Presiding Officer applied the correct legal standards, along with the correct burdens of proof and production, to the matter before CT Page 4562 it.
General Statutes § 46a-60(a)(1) specifically provides for an exception to liability for employment discrimination, where a bona fide occupational qualification or need exists and is proven by the employer. Where there is overt discrimination, however, the blanket exclusion of a class is a bona fide occupational qualification only if the employer demonstrates that "`no member of the class excluded is physically capable of performing the tasks required by the job.'" ConnecticutInstitute for the Blind v. CHRO, 176 Conn. 88, 93-95,405 A.2d 618 (1978), quoting Evening Sentinel v. National Organizationfor Women, 168 Conn. 26, 36, 357 A.2d 498 (1975). In the present case, the Presiding Officer properly found that EB could not assert the BFOQ defense, in light of its finding that EB had conceded its failure to prove the requirement of the defense set forth above. Record: #1, Presiding Officer's Decision, at 17-18, citing EB's Brief, dated January 17, 1992, at 8-9.
As pointed out by the Presiding Officer in his decision, however, our courts have long held that it is appropriate to look to federal employment discrimination law for guidance in interpreting and enforcing Connecticut's antidiscrimination statute. State v. CHRO, 211 Conn. 464, 470, 559 A.2d 1120
(1989); Wroblewski v. Lexington Gardens, Inc., 188 Conn. 44,53, 448 A.2d 801 (1982); Pik-Kwik Stores, Inc. v. CHRO,170 Conn. 327, 331, 365 A.2d 1210 (1976). It is proper for a hearing officer to follow federal law in the area of employment discrimination, however, only insofar as such law does not conflict with legal precedent already established in the state of Connecticut.
It has been held, as noted by the Presiding Officer, that hearing impaired persons may not be qualified, as a result of their hearing impairment, to perform certain jobs or engage in certain activities; see, e.g., Southeastern Community Collegev. Davis, 442 U.S. 397, 99 S.Ct. 2361, 2371, 60 L.Ed.2d 980
(1979) (nursing program); Caylor v. Alexander, 29 FEP Cases 727, 728 (M.D.Ala. 1981) (aerial photographer); and that safety is an appropriate area of inquiry in assessing the liability of an employer charged with a violation of an antidiscrimination statute. See Serrapica v. City of NewYork, 708 F. Sup. 64, 73 (S.D.N.Y.), aff'd, 888 F.2d 126 (1989); see also School Board of Nassau County v. Arline,
CT Page 4563480 U.S. 273, 107 S.Ct. 1123, 1130-31, 94 L.Ed.2d 307 (1987);Civil Service Comm'n. v. CHRO, Superior Court, judicial district of Waterbury, Docket No. 111369 (February 7, 1994, McDonald, J.) (a "city has a right to ensure that those it would hire to be police officers possess sufficient good health to perform police duties" in light of concerns regarding "[t]he public safety and [the] safety of the police themselves").
The employer bears the burden of proving the safety defense. Jansen v. Food Circus Supermarkets, 52 FEP Cases 1632, 541 A.2d 682, 691-92 (N.J. 1988). The legal standard to be applied is whether there would have been a reasonable probability of substantial harm to the applicant or others with respect to the specific jobs in issue. Id., 692;Mantolete v. Bolger, 767 F.2d 1416, 1422 (9th Cir. 1985). SeeMaine Human Rights Comm'n. v. Canadian Pacific Ltd., 31 FEP Cases 1028, 1035 (Me. 1983); Bey v. Bolger, 32 FEP Cases 1652, 1663 (E.D.Pa. 1982).
 The reasonableness of the probability necessarily must include some evaluation of the job itself and its setting. What may be a reasonable risk for a postal worker, as in Mantolete, whose job generally does not pose great hazards to those who perform it or to the public they serve, is not necessarily a reasonable risk for a firefighter, whose job is defined at almost every turn by the potential for disaster to himself and others.
DiPompo v. West Point Military Academy, 770 F. Sup. 887, 894
(S.D.N.Y. 1991). In this regard, as noted by the Presiding Officer, the analysis in physical disability cases should be modified to include the concept of reasonable accommodation. See Wallace v. Veteran's Adm., 683 F. Sup. 758, 764-65 (D.Kan. 1988); Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir. 1991).
As noted above, however, federal law in the area of employment discrimination should not be followed to the extent that it conflicts with Connecticut caselaw. Both the appellate and supreme courts of Connecticut have recently turned to the United States Supreme Court's decision in PriceWaterhouse v. Hopkins, supra, 490 U.S. 228, 246 (plurality opinion) for an assessment of how to allocate the burdens of CT Page 4564 proof and production in a case where, as here, direct evidence of discrimination is found to exist:
 Price Waterhouse v. Hopkins, supra, . . . enunciated the standard to be applied where there is direct evidence of discrimination. "Price Waterhouse was a so-called `mixed motives' case, where the employer made a showing that the plaintiff's interpersonal problems were a legitimate concern despite evidence of discrimination against her based on gender. The court stated that, where the plaintiff had introduced sufficient evidence that prohibited discrimination had played a motivating part in her rejection from promotion the employer had to establish by a preponderance of the evidence that a legitimate reason would have led to the same decision in the absence of discrimination. The critical inquiry is whether the discriminatory motive was a factor in the decision at the moment it was made. An alleged discriminator may not prevail in a mixed motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision. (Emphasis added.) The plaintiff does, however, retain the burden of persuasion on the issue of whether a discriminatory motive played a part in the decision. Once the plaintiff has adduced sufficiently persuasive direct evidence that the defendant relied on a discriminatory motive, and the defendant has failed to show by a preponderance of the evidence that a legitimate reason existed at the time of the decision and had motivated that decision, the factfinder may render a judgment for the plaintiff."
(Citations omitted.) Levy v. CHRO, supra, 35 Conn. App. 482-83, quoting Miko v. CHRO, supra, 220 Conn. 205-06. Accordingly, the Presiding Officer's application of the safety defense to O'Brien may be upheld only if the legal standards set forth in Miko v. CHRO, supra, and Levy v. CHRO, supra, are also found to have been followed.
In the present matter, the court finds that the Presiding Officer correctly applied the legal standards set forth above, CT Page 4565 despite the fact that it did not cite to either PriceWaterhouse v. Hopkins, supra, Miko v. CHRO, supra, or Levy v.CHRO, supra. After finding that EB's blanket policy, of excluding from employment all applicants who failed to pass a threshold mark on a hearing test, constituted overt discrimination; record: #1, Presiding Officer's Decision, at 15; the Presiding Officer properly shifted the burden of proof to EB to justify its actions by proving that it had a legitimate, nondiscriminatory reason for refusing to hire O'Brien at the time he applied for the forklift operator position. Id., at 16-18, 22-26.
After considering all of the evidence in the record, the Presiding Officer then concluded that EB had "met its burden of proof with respect to legitimate safety concerns arising out of a person's difficulty in localizing sound while driving a forklift."
Id., at 25-26. In reaching this conclusion, the Presiding Officer pointed out that:
 Unlike the other two, [O'Brien's] job as a forklift driver required him to be more mobile and travel throughout the shipyard. He has to have the ability to react to changing circumstances especially in light of the fact his forward view is frequently blocked by the material he is transporting. [EB]'s experts Hans and Dr. LaCroix stated O'Brien's condition affected his ability to localize and lateralize sound which is critical for the safe operation of a forklift in the shipyard.
Moreover, the Presiding Officer specifically indicated that said legitimate safety concerns existed at the time that EB refused to hire O'Brien for the forklift operator position, in light of his finding that "Hans [EB's Audiologist] indicated apart from the application of the blanket policy, he would not have recommended O'Brien for placement based on his inability to localize and lateralize sound." Id., at 26. The court finds that there is substantial evidence in the record to support this factual finding. See Record: #4, Transcript, at 536-43, 549; see also #1, Presiding Officer's Decision, at 9, FOF #28.
Finally, the Presiding Officer specifically found that CT Page 4566 "[t]he evidence shows accommodation for the forklift position was not possible." Record: #1, Presiding Officer's Decision, at 26. In this regard, the court points out that evidence in the record does establish that "[t]here are no non-productive areas where a forklift operator . . . could be assigned. They would have to be qualified to work in a different occupation." Record: #146, EB's Exhibit I, EB File re: O'Brien, at 8.
Based on the foregoing, the court finds that the Presiding Officer did not abuse his discretion in concluding that O'Brien was legally denied employment as a forklift operator at EB. This is so, moreover, despite the fact that the Presiding Officer relied on the so-called "safety defense" in reaching his conclusions. The CHRO is correct in its assertion that such a defense has not yet been recognized as a defense to employment discrimination in the state of Connecticut. Nonetheless, this court finds that, just as "a `safety defense' may be inherently part of an employer's BFOQ defense"; General Dynamics Corp., Electric Boat Division v.CHRO, Superior Court, judicial district of New London, at New London, Docket No. 524412 (August 9, 1993, Hurley, J.); a safety defense may also be inherently part of an employer's legitimate, nondiscriminatory reason for refusing to hire an individual under Miko v. CHRO, supra, and Levy v. CHRO, supra. Indeed, under certain circumstances, safety concerns may serve as the sole legitimate, nondiscriminatory reason for refusing to hire an individual. See, e.g., Levy v. CHRO, supra,35 Conn. App. 484, ("[t]he plaintiff's hearing was a legitimate factor to consider because it was directly related to his ability to drive a truck safely").
Accordingly, the court holds that where, as here, a Presiding Officer utilizes the safety defense analysis within the parameters of Connecticut caselaw, and the burdens of proof set forth therein, no abuse of discretion has occurred.
D. Emotional Distress Damages
The CHRO also alleges that the Presiding Officer erred by concluding that the CHRO lacks authority to award damages for emotional distress, because both the wording of General Statutes § 46a-86(a), as well as the legislative history thereof, indicate that such damages are authorized. In response, EB argues that the only damages recoverable under Connecticut's Fair Employment Practices Act, General Statutes CT Page 4567 § 46a-51 et seq., are those damages specifically enumerated therein. It follows, EB argues, that, because emotional distress damages for employment discrimination are not enumerated in the applicable statute, General Statutes § 46a-86(a), the CHRO is not authorized to award them unless and until the General Assembly legislates otherwise.
At the time the parties submitted their respective briefs in this matter, a split of authority existed in the Connecticut Superior Court regarding the issue of whether the CHRO may award emotional distress damages for employment discrimination. Cf. Silhouette Optical Ltd. v. CHRO, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 520590 (January 27, 1994, Maloney, J.) (holding that the CHRO is authorized to award emotional distress damages for employment discrimination) Bridgeport Hospitalv. CHRO, 9 CSCR 213 (January 31, 1994, Maloney, J.) (same), with Fenn Mfg. Co. v. CHRO, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 509435 (February 8, 1994, Sheldon, J.) (holding that the CHRO is not authorized to award such damages).
Since that time, however, the Connecticut Supreme Court has heard appeals in both cases, and has definitively ruled that, in light of traditional rules of statutory construction, as well as the legislative history surrounding General Statutes § 46a-86, the CHRO is not authorized to award damages for emotional distress in employment discrimination cases brought pursuant to General Statutes § 46a-60(a)(1).Bridgeport Hospital v. CHRO, 232 Conn. 91, 100-10, ___ A.2d ___ (1995); Fenn Mfg. Co. v. CHRO, 232 Conn. 117, 122, ___ A.2d ___ (1995). Accordingly, the court holds that the Presiding Officer properly concluded that the CHRO was not authorized to award damages for emotional distress in this case.
E. Simonelli: Back Pay Fringe Benefits
Finally, the CHRO alleges that the Presiding Officer erred in failing to provide complete relief to Simonelli under General Statutes § 46a-86. In this regard, the CHRO argues that the Presiding Officer erred for the following specific reasons: (1) absent proof to the contrary by EB, Simonelli should have been reinstated to a Class I Inside Machinist position, at the maximum rate of pay; (2) Simonelli should CT Page 4568 have been granted all back pay due and owing from April 5, 1983 until the date of the hearing; that is, Simonelli should have been awarded back pay after December 31, 1985; (3) Simonelli's award of back pay should not have been limited to the amount of $27,500, because this figure constitutes a miscalculation of the amount of back pay due and owing from April 5, 1983 until December 31, 1983;[2] and (4) Simonelli should have been awarded pension benefits and credits from April 5, 1983 through the present based upon the amount of wages he would have earned had he been hired on April 5, 1983, and all benefits, with interest, to which he would have been entitled under EB's Savings Plan.
In response, EB, directing the court to Exhibit A of its brief, argues that the Presiding Officer's award of damages to Simonelli was entirely reasonable, in light of the fact that, overall, Simonelli was $52,000 ahead of the game as a result of not being hired by EB.
1. Back Pay Fringe Benefits
General Statutes § 46a-86, which authorizes the awarding of back pay, provides, in pertinent part, as follows:
 (a) If, upon all the evidence presented at the hearing conducted pursuant to section 46a-84, the presiding officer finds that a respondent has engaged in any discriminatory practice, the presiding officer shall state his findings of fact and shall issue and file with the commission and cause to be served on the respondent an order requiring the respondent to cease and desist from the discriminatory practice and further requiring the respondent to take such affirmative action as in the judgment of the presiding officer will effectuate the purpose of this chapter.
 (b) In addition to any other action taken hereunder, upon a finding of a discriminatory employment practice, the presiding officer may order the hiring or reinstatement of employees, with or without back pay, or restoration to membership in any respondent labor organization, provided, liability for back pay shall not accrue from a date more than two years prior to the filing CT Page 4569 or issuance of the complaint and, provided further interim earnings, including unemployment compensation and welfare assistance or amounts which could have been earned with reasonable diligence on the part of the person to whom back pay is awarded shall be deducted from the amount of back pay to which such person is otherwise entitled. The amount of any such deduction for interim unemployment compensation or welfare assistance shall be paid by the respondent to the commission which shall transfer such amount to the appropriate state or local agency.
(Emphasis added.) The Connecticut Supreme Court, in construing this statute, has held that a CHRO hearing officer who finds that an employer has discriminated against an individual is obligated to "render a decree which will, so far as possible, eliminate the discriminatory effects of the past as well as bar like discrimination in the future." (Citations omitted; internal quotation marks omitted.) Civil ServiceCommission v. CHRO, 195 Conn. 226, 231, 487 A.2d 201 (1985). Thus, a victim of unlawful employment discrimination is entitled to monetary relief to restore him to his "rightful economic status absent the effects of the unlawful discrimination." State v. CHRO, supra, 211 Conn. 484. In calculating such relief, however, the hearing officer is required to reduce the amount of the back pay award by the amount that the claimant could earn, or has earned, using reasonable mitigation efforts. General Statutes § 46a-86(b); see also Cassino v. Reichhold Chemicals, Inc., supra, 817 F.2d 1338,1346-47 (9th Cir. 1987), cert. denied, 484 U.S. 1047,108 S.Ct. 785, 98 L.Ed.2d 870 (1988).
In the present case, the Presiding Officer ordered EB to pay Simonelli $27,500 in back pay, $1,884.85 in medical costs, interest at the legal rate, reasonable attorneys fees, and provide accrued seniority with appropriate pension credit." Record: #1, Presiding Officer's Decision, at 27. In reaching this determination, the Presiding Officer adopted that portion of EB's Post Hearing Brief relating to Simonelli's claims for damages. Id. Said portion of that brief was attached, as Exhibit A, to the brief submitted by EB to this court. As pointed out by EB, a comparison of the wage chart in said exhibit to Record: #14, CHRO Exhibit 1A, Agreement — Book 1 Metal Trades Council, dated 1982-1985, at 121, makes clear CT Page 4570 that the wage chart is based on the First Class wage rate from Simonelli's date of hire.
Additionally, as pointed out by EB, said exhibit and wage chart, which contain ample citations to the record, support the Presiding Officer's conclusion that, beginning in 1986, Simonelli was making considerably more money at Bostitch than he would have made had he been working at EB. Indeed, if the entire time period, from denial of EB employment (May, 1983) to date of hearing (December, 1990) is implicated, the record supports the Presiding Officer's conclusion that Simonelli made approximately $52,000 more in interim earnings than he would have made had he been hired by EB. See Record: #1, Presiding Officer's Decision, at 27.
Finally, as pointed out by EB, the record, exhibit and wage chart indicate that Simonelli received substantially similar and equivalent fringe benefits from Bostitch and, any alleged lost fringe benefits, in the context of Simonelli earning $52,000 more in interim earnings, were more than offset by those interim earnings. Accordingly, the court finds that the Presiding Officer's refusal to award Simonelli back pay beyond December 31, 1985, and refusal to award Simonelli additional fringe benefits in the nature of either a pension or savings plan, was proper, is supported by substantial evidence on the record, and should not be disturbed.
2. Reinstatement as Class I Inside Machinist
As noted earlier, on August 25, 1992, the Presiding Officer, in response to the CHRO's Motion for Rehearing, issued an order clarifying his earlier decision, stating that "Mr. Simonelli is to be reinstated to the position he originally applied for at Electric Boat," and that, "[o]nce reinstated, accumulated seniority may entitle him to a higher grade position."
The CHRO argues that this was error, and that the Presiding Officer should have ordered that Simonelli be placed as a Class I machinist at the maximum pay level for that class. In support of this assertion, the CHRO points to the fact that Simonelli had over 30 years experience prior to applying at EB, and the testimony of Union representative for EB's machinists, Everett Corey, who indicated that employees CT Page 4571 with machinist experience are usually placed at Class I after completing a ninety-day probation period and that their wage level is also tied to the extent of their experience.
As noted above, however, the Presiding Officer's award of back pay to Simonelli was calculated as if he held a Class I Inside Machinist position from the date he would have begun working at EB had he been hired. That is, the Presiding Officer's award did not require that Simonelli be treated as a Class II Inside Machinist for the ninety-day probationary period. Accordingly, the court finds that the Presiding Officer did not abuse his discretion by essentially requiring Simonelli to serve this ninety-day probationary period upon reinstatement.
IV. CONCLUSION
The court concludes that the Presiding Officer's application of the so-called "safety defense," within the parameters of Connecticut caselaw, to EB's refusal to place O'Brien in a forklift operator's position, did not constitute an abuse of discretion. Additionally, the court finds that the Presiding Officer properly concluded that the CHRO is not authorized to award damages for emotional distress in employment discrimination cases. Finally, the court finds that substantial evidence exists on the record to support the Presiding Officer's award of damages to Simonelli. In short, the court finds no error of law, no lack of facts to support the conclusions reached, and no abuse of discretion. Accordingly, the CHRO's appeal is hereby denied.
Hurley, J.